957 So.2d 538 (2007)
Glen Edward ROGERS, Appellant,
v.
STATE of Florida, Appellee.
Glen Edward Rogers, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC05-732, SC05-1730.
Supreme Court of Florida.
January 18, 2007.
As Modified on Denial of Rehearing May 24, 2007.
*541 John W. Jennings, Capital Collateral Regional CounselMiddle Region, Richard E. Kiley and James V. Viggiano, Jr., Assistant CCR CounselMiddle Region, Tampa, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, and Stephen D. Ake, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Glen Edward Rogers appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death, and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the trial court's order and deny the petition for a writ of habeas corpus.

FACTS AND PROCEDURAL HISTORY
Rogers was convicted of the 1995 murder of Tina Marie Cribbs. The pertinent *542 facts of this case are set forth in this Court's opinion on direct appeal as follows:
Cribbs was last seen alive leaving the Showtown Bar in Tampa with Rogers on Sunday, November 5, 1995. A bartender testified that Rogers arrived at the bar around 11 a.m. Cribbs and three female friends arrived a few hours later. . . . Rogers asked Cribbs, the only single woman of the group, for "a ride" and she agreed. Upon leaving the bar with Rogers, Cribbs told one of her friends that she would be back in fifteen or twenty minutes to meet her mother.
. . . .
A motel clerk testified that Rogers had arrived at the motel by cab on Saturday, November 4, 1995. Rogers told the motel clerk that he was a truck driver whose truck had broken down. At that time, Rogers paid for a two-night stay. A desk clerk testified that Rogers returned to the motel office on Sunday evening, November 5, 1995. . . . According to the clerk, it appeared as if Rogers was packing a white Ford Festiva automobile. Rogers then entered the motel office, paid for an additional night's stay at the motel, informed the clerk that he did not want anyone going into his room, and requested a "Do Not Disturb" sign. When the clerk informed Rogers that the motel did not have such signs, Rogers requested that the clerk leave a note for the cleaning crew not to enter and clean his room. The next morning, at approximately 9 a.m., the clerk saw Rogers leaving the motel alone in the same white automobile. The evidence at trial established that the white vehicle belonged to Cribbs.
On Tuesday, November 7, 1995, a cleaning person at the motel went into the room that Rogers had rented. The cleaning person noticed a handwritten "Do Not Disturb" sign hanging on the doorknob. She testified that she had observed the same sign hanging on the door on Monday morning and thus did not enter the room to clean it. Upon entering the room on Tuesday, the cleaning person found Cribbs' body in the bathroom.
Rogers v. State, 783 So.2d 980, 985 (Fla. 2001) (footnote omitted). One week later, Rogers was arrested while driving Cribbs' car in Kentucky. The Kentucky Police Department inventoried Cribbs' car and found, among other things, blood-stained blue jean shorts and a key to the motel room where Cribbs' body was discovered.[1]
At trial, the State's pathologist stated that Cribbs died from two stab wounds one to the chest and one to the buttocks. The State's forensic serologist testified that no evidence of semen was found in Cribbs' body. The State's DNA expert acknowledged that neither Cribbs nor Rogers could be excluded as a contributor to the blood stains on the blue jean shorts. Additionally, the State introduced evidence that Cribbs' wallet was found at a highway rest area near Tallahassee on November 6, 1995, the same day the motel clerk said Rogers left the motel in Tampa. A crime lab analysis of the wallet identified latent fingerprints belonging to Rogers. Rogers introduced evidence that the area surrounding the motel was a high crime area, *543 that many of the residents at the motel and within close proximity had criminal records, and that the Tampa Police Department failed to investigate any of these potential suspects. Id. at 986-87.
Rogers was convicted of first-degree murder, armed robbery, and grand theft of a motor vehicle. Id. at 985. The jury unanimously recommended the death penalty and the trial court sentenced Rogers to death. Id. at 987.[2]
On direct appeal, Rogers raised ten issues.[3] This Court rejected all of Rogers' arguments and concluded that there was "competent substantial evidence to support a conviction for first-degree murder based on either premeditation or felony murder." Id. at 990. The Court affirmed Rogers' convictions and death sentence. Id.
Rogers then filed an amended motion for postconviction relief under Florida Rule of Criminal Procedure 3.851.[4] Following *544 a Huff[5] hearing, the circuit court granted an evidentiary hearing on two of Rogers' ineffective assistance of counsel claims, namely, the failure to develop an alternative suspect and the failure to object to improper prosecutorial comments during closing argument of the penalty phase, and his cumulative error claim. The circuit court summarily denied the rest of the claims.
At the evidentiary hearing, Rogers presented the testimony of several witnesses, including Robert Fraser, Rogers' penalty-phase counsel, who testified why he did not object to prosecutorial comments made during closing arguments of the penalty phase, and Nick Sinardi, Rogers' guilt-phase counsel, who testified regarding his investigation into Joseph Lundin as an alternative suspect, his decision not to develop a defense implicating Lundin, and his reasons for not calling various witnesses at trial. Additionally, Mitchell Monteverdi, a co-inmate of Rogers and Lundin, testified concerning an alleged statement Lundin made to Monteverdi wherein Lundin admitted killing Cribbs and depositions Monteverdi gave to prosecutors regarding the alleged jailhouse conspiracy to implicate Lundin in Cribbs' murder. Rogers testified regarding the alleged conspiracy to frame Lundin and why he thought certain witnesses did not testify at trial. In rebuttal, the State presented the testimony of Douglas Vieniek, an investigator for the state attorney, and Lyann Goudie, one of the prosecutors assigned to Rogers' case.
After the evidentiary hearing, the circuit court issued an order denying relief on all remaining claims. Rogers appeals and raises five issues for this Court's review.[6] Rogers also petitions this Court for a writ of habeas corpus, raising four issues.[7] We address each of these issues below.

*545 ANALYSIS

A. MOTION FOR POSTCONVICTION RELIEF
1. Ineffective Assistance of Counsel during the Guilt Phase
This Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied: "As to the first prong, deficient performance, a defendant must establish conduct on the part of counsel that is outside the broad range of competent performance under prevailing professional standards." Gore v. State, 846 So.2d 461, 467 (Fla.2003) (citations omitted). As to the second prong, prejudice, a defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Morris v. State, 931 So.2d 821, 828 (Fla. 2006) (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).
Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. Morris, 931 So.2d at 828.
(A) Failure to Develop an Alternative Suspect
In his first issue on appeal, Rogers asserts that the lower court erred in denying his claim that trial counsel was ineffective for failing to present evidence of an alternative suspect, Jonathan Lundin, and failing to present the testimony of Robert Thompson. In the alternative, Rogers argues that prosecutorial misconduct deprived him of a reliable adversarial testing. Each of these sub-claims will be addressed in turn.
(i) Failure to Develop Joseph Lundin as an Alternative Suspect
Rogers first contends that the trial court erred in denying his claim that attorney Sinardi provided ineffective assistance by failing to develop and present evidence of an alternative suspect, Jonathan Lundin. We disagree.
Strategic decisions are not considered deficient performance when other courses have been weighed and the decision is reasonable under the circumstances. See, e.g., Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). Attorney Sinardi first learned of Lundin through an investigative report that detailed an interview with Mitchell Monteverdi, who was incarcerated with Rogers and Lundin during the period preceding Rogers' trial. He began by deposing Monteverdi to obtain sworn testimony of Lundin's alleged statement against interest"the bitch had to answer to me."[8] Counsel also searched Lundin's criminal record report, compared the autopsy reports of Cribbs and the victim of a murder by Lundin,[9] and unsuccessfully attempted to locate witnesses who could identify Lundin as being in the vicinity of Rogers' motel room at the time of the murder. Attorney Sinardi ultimately decided, as a matter of trial strategy, *546 that offering such evidence was not worth the risks to Rogers' case.
Monteverdi's testimony would have been extremely risky to the defense. Not only would his credibility have been easily attacked,[10] but the State could have impeached Monteverdi with his prior inconsistent statement acknowledging the existence of a jailhouse conspiracy to frame Lundin for Cribbs' murder.[11] Furthermore, the State could have introduced evidence to prove the existence of the jailhouse conspiracy. Therefore, trial counsel was not deficient for failing to develop Lundin as an alternative suspect.
In addition, Rogers has failed to demonstrate prejudice that "so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." Davis v. State, 928 So.2d 1089, 1104-05 (Fla.2005), cert. denied, ___ U.S. ___, 127 S.Ct. 206, 166 L.Ed.2d 166 (2006). First, Lundin was not a viable alternative suspect. Prosecutor Goudie testified at the evidentiary hearing that she was confident Lundin was not in Florida at the time of Cribbs' murder because she was the prosecutor on Lundin's murder case and was privy to information regarding his location at the time in question. Had Rogers attempted to offer Lundin as an alternative suspect, the prosecutor would have established that Lundin could not possibly have committed this murder. Second, as noted above, the State could have impeached Monteverdi on his testimony implicating Lundin by introducing his prior inconsistent statement and offered substantive evidence of the conspiracy to frame Lundin for Cribbs' murder. Third, the evidence against Rogers was overwhelming. The State had introduced a wealth of incriminating evidence against Rogers: Cribbs was last seen leaving a bar with Rogers; a motel clerk testified that, on the day after the murder, she saw Rogers pack suitcases into Cribbs' automobile, pay for an additional night and repeatedly demand that no one go into his room; Rogers made elaborate efforts to keep hotel staff from entering his room, including writing a "Do Not Disturb" sign on his door; Cribbs' wallet containing Rogers' fingerprints was found in a highway rest stop outside Tallahassee; and Rogers was arrested in Kentucky while driving Cribbs' automobile, which contained the key to the motel room where Cribbs was found murdered. Even if none of the risks of presenting Lundin as an alternative suspect discussed above were present, trial counsel's rejection of this strategy would not undermine our confidence in the outcome.
(ii) Failure to Present Robert Thompson as a Witness
Rogers next contends that his attorney provided ineffective assistance of counsel relating to the testimony of Thomas Ambrose by failing to call another witness, Robert Thompson. Ambrose was discovered during the penalty phase of the trial and testified that he saw Cribbs with another individual (not Rogers) on the evening of the murder. See Rogers, 783 So.2d at 1003. Rogers moved for a new trial based on this newly discovered evidence. The trial court denied the motion because the testimony "would not have produced an acquittal on retrial." Id. On appeal, this Court affirmed, agreeing with the trial *547 court that Ambrose's testimony "was inconsistent, incredible, unbelievable, and [contradicted] the physical evidence in the case." Id. at 1004.
In his amended rule 3.851 motion, Rogers argued that counsel was ineffective for failing to call Thompson because he would have testified that he saw Cribbs walking back toward the hotel with an older white male on the night of the murder. Rogers contended that if Thompson had been called to testify at trial, the similar account given by newly discovered witness Ambrose would have provided sufficient corroboration to create reasonable doubt and justify a new trial.
First, this assertion is simply unsupported by the record. According to trial counsel, Thompson would have testified that he saw Cribbs with an "older white male" on the night of the murder, whereas Ambrose testified that he saw Cribbs with a Mexican or Hispanic male. Thompson would not have corroborated Ambrose's testimony; rather, he likely would have contradicted it. Second, defense counsel stated that Thompson would have provided extremely damaging testimony that Rogers was the last man he saw Cribbs with that night, that Rogers told Thompson to call him Kentucky, that Rogers was acting suspicious, that Rogers was "fumbling" with Cribbs' car, and that Thompson was scared of Rogers in general. Counsel made a reasonable strategic decision not to call Thompson because his testimony could have seriously damaged Rogers' defense and, in fact, could have further implicated Rogers in the crime. Thus, counsel was not deficient for failing to call Thompson. See Lamarca v. State, 931 So.2d 838, 849 (Fla.2006) (denying ineffective assistance claim for failing to call a witness when defense counsel believed that the testimony would have been incriminating to the defense); Marquard v. State, 850 So.2d 417, 428 (Fla.2002) (denying ineffective assistance claim for failing to call witnesses when defense counsel reasonably feared the witnesses would implicate the defendant in the crime). Accordingly, we affirm the trial court's denial of relief as to this sub-claim.
(iii) Prosecutorial Misconduct
Rogers next alleges that two instances of prosecutorial misconduct during the guilt phase deprived him of a reliable adversarial testing. The lower court determined that this claim was cognizable as a claim of ineffective assistance of counsel and then summarily denied it on the merits. However, Rogers failed to specifically plead any valid ineffective assistance claim in either the amended rule 3.851 motion or his initial brief on appeal to this Court; rather, he chose to substantively argue the issue as one of prosecutorial misconduct.
First, Rogers asserts that the State's warrantless search of the jail was improper. We have consistently held that "substantive claims of prosecutorial misconduct could and should [be] raised on direct appeal and are thus procedurally barred from consideration in a post-conviction motion." Spencer v. State, 842 So.2d 52, 60 (Fla.2003); see also Lamarca, 931 So.2d at 851 n. 8 (holding postconviction claims of prosecutorial misconduct procedurally barred because they could have been raised on direct appeal). Accordingly, we affirm the denial of this claim on grounds that it is procedurally barred.
Additionally, Rogers asserts that the prosecutor's actions in taking an unnoticed deposition of Monteverdi and threatening him with perjury dissuaded Monteverdi from testifying for the defense. As previously stated, Monteverdi's testimony would have seriously jeopardized the defense's case and counsel's failure to present him as a witness does not undermine *548 our confidence in the outcome. Thus, any claim alleging that prejudice resulted in the failure of Monteverdi to testify because of prosecutorial misconduct is likewise without merit.
(B) Failure to Object During Guilt-Phase Closing Argument
In his next issue on appeal, Rogers contends that the trial court erred in summarily denying his claim that counsel was ineffective during the guilt phase for failing to object to improper prosecutorial comments during the State's closing argument. Specifically, Rogers argues that trial counsel was ineffective for failing to object to the following comments: (1) repeatedly referring to defense counsel's vivid imagination and how the defense's closing argument was a product of that imagination; (2) bolstering the credibility of Dr. Schultz, the State's expert who performed the autopsy; and (3) bolstering the credibility of the Kentucky Police Department, which arrested Rogers and performed serology and fingerprint testing on the vehicle and the items founds therein. The circuit court summarily denied this claim, finding the prosecutor's comments to be proper rebuttal when viewed in tandem with defense counsel's closing argument.[12] We agree with this assessment.
After reviewing the guilt-phase closing arguments, we disagree with Rogers' assertion that the arguments regarding Dr. Schultz and the Kentucky Police Department constituted impermissible bolstering. Defense counsel directly attacked the credibility of Dr. Schultz and the Kentucky police witnesses, and the prosecutor's response to these attacks was within the permissible bounds of advocacy. Similarly, we disagree with Rogers' assertion that the prosecutor's arguments regarding defense counsel were improper. The prosecutor's comments rebutted defense counsel's closing argument, in which he presented theories that were not based on facts in evidence. Because none of the closing arguments were improper, counsel cannot be deemed ineffective in failing to object to them. See Mungin v. State, 932 So.2d 986, 997 (Fla.2006) (holding that defense counsel was not ineffective for failing to object because none of the comments were improper); Walls v. State, 926 So.2d 1156, 1166 (Fla.2006) (holding that defense counsel was not ineffective for failing to object to comments that were proper responses to the preceding argument by the defense).
2. Ineffective Assistance of Counsel During the Penalty Phase
Rogers next asserts that the trial court erred in denying his claim that defense counsel provided ineffective assistance for failing to object to the prosecutor's comments during the penalty-phase closing argument.[13] Specifically, Rogers argues that trial counsel was ineffective for failing to object to the following prosecutorial comments: discussing the victim's perceptions and thoughts just before her death; denigrating the statutory mitigator that Rogers had an impaired capacity to appreciate the criminality of his conduct by asserting that voluntary intoxication and brain damage are no excuse for murder; denigrating *549 the non-statutory mitigator that Rogers had a childhood deprived of love and affection by asserting that Rogers was an adult who should stop blaming his parents for his behavior; and making the "Desert Storm" argument by comparing her father's sense of duty to serve in the military, even when faced with brain cancer, to the jury's duty to sentence Rogers to death. This Court reviewed the prosecutor's comments about voluntary intoxication, a childhood deprived of love, and "Desert Storm" on direct appeal; however, we have not previously addressed the comments regarding the victim's perceptions prior to death and Rogers' alleged brain damage.
We will begin our analysis by examining the propriety of the comments because, as stated in connection with the guilt-phase closing argument claim, trial counsel cannot be deemed ineffective for failing to object to arguments that are proper. First, we address the two prosecutorial comments that were not specifically raised on direct appeal.
Rogers initially alleges that the prosecutor improperly theorized about Cribbs' perceptions at the time of the murder. The prosecutor stated the following:
We know that she knew she was going to be killed, . . . we know when she was stabbed the first time, she didn't become unconscious; she remained conscious and she could feel the pain of the knife going through her body and could feel the pain of the knife as it was twisted and pulled out of her body, and then he did it again.
. . . .
What weight do you give to the ten, twenty minutes where she was there in that bathroom reflecting back on her life, on the things that she hadn't done that she wished she could, the opportunities that had never been presented to her, on her children that she would never see again, on her mother who loved her so dearly. . . .
These arguments were not improper because they were based upon facts in evidencethe victim was stabbed twice, she struggled with her assailant, and she remained alive for at least a short period of time after being stabbed. See Rogers, 783 So.2d at 994. Additionally, this is not a case in which the prosecutor made an improper "golden rule" argument by attempting to place the jury in the position of the victim. See Garron v. State, 528 So.2d 353, 358-59 (Fla.1988) (holding that comments such as, "[Y]ou can just imagine the pain of [the victim]. . . . Imagine the anguish and the pain [the victim] felt," improperly placed the jury in the position of the victim) (first alteration in original). Rather, the prosecutor was describing the heinousness of the crime for the purpose of establishing the HAC aggravator. This Court has held that for purposes of the HAC aggravator, "a common-sense inference as to the victim's mental state may be inferred from the circumstances." Banks v. State, 700 So.2d 363, 366 (Fla.1997). Accordingly, we conclude that trial counsel was not deficient for failing to object.
Rogers also contends that the prosecutor improperly denigrated the statutory mitigator concerning his capacity to appreciate the criminality of his conduct by stating: "Mr. Rogers is a violent, aggressive person and brain damage has nothing to do with it." Although we have held that denigrating a statutory mitigator is improper, see Brooks v. State, 762 So.2d 879, 904 (Fla.2000) (holding that repeated characterization of mitigating circumstances as "flimsy," "phantom," and "excuses" was improper denigration), that is not what occurred in this case. The prosecutor was merely responding to defense *550 counsel's argument that Rogers' aggressive behavior was due to a history of head trauma, a brain contusion, and damage to the frontal and temporal lobes of his brain. Accordingly, counsel is likewise not deficient for failing to object to this comment.
Second, we address the prosecutorial comments raised by Rogers that were previously reviewed on direct appeal: the discussion of voluntary intoxication as it related to the statutory mitigator of an impaired capacity to appreciate the criminality of the conduct, the discussion of the nonstatutory mitigator of a childhood deprived of love, and the "Desert Storm" comment. The only comment we found improper was the reference to Desert Storm. Rogers, 783 So.2d at 1002. Because trial counsel cannot be deemed ineffective for failing to object to comments that are proper, see Mungin, 932 So.2d at 997, the failure to object to the Desert Storm reference is the sole remaining basis of this ineffective assistance claim. Thus, Rogers must establish that the failure to object to this single comment constitutes deficient performance and that, as a result of the deficient performance, our confidence in the penalty-phase outcome is undermined. We do not address deficient performance because we conclude that prejudice has not been established.
During penalty-phase closing argument, prosecutor Cox discussed how her father decided to serve in Operation Desert Storm even after being diagnosed with brain cancer. Essentially, Cox equated her father's "noble sacrifice for his country with the jury's moral duty" to sentence Rogers to death. Addressing this argument on direct appeal, we held that this "single unobjected-to argument [did not] constitute fundamental error, nor does it warrant a mistrial." Rogers, 783 So.2d at 1002 (citation omitted). This Court has held that counsel's failure to object to improper comments cannot prejudice the outcome if the comments were raised on direct appeal and do not rise to the level of fundamental error. See Chandler v. State, 848 So.2d 1031, 1045-46 (Fla.2003).[14]
Moreover, the existence of strong aggravation and relatively weak mitigation further supports our conclusion that prejudice cannot be demonstrated. Because we find that Rogers has failed to demonstrate that counsel's failure to object to any of the prosecutorial comments resulted in ineffective assistance, we affirm the trial court's denial of relief on this claim.
3. Newly Discovered Evidence
In his next issue on appeal, Rogers asserts that newly discovered evidence renders his conviction unreliable and compels a new trial. Specifically, he alleges that the trial court erred in summarily denying his claim that newly discovered evidence of alleged improprieties at the FBI lab would have impeached the testimony of the State's DNA expert, Dr. Baechetel, and vitiated the only piece of evidence implicating Rogers in Cribbs' murdera pair of Rogers' blue jean shorts that contained a mixed stain of biological materials.
At trial, Dr. Baechetel testified that he performed the DNA analysis of the mixed stain found on Rogers' blue jean shorts. *551 He explained that he used the PCR method of analysis on the mixed stain, which is less likely than other DNA tests to exclude possible contributors to a sample. Neither Cribbs nor Rogers could be excluded as contributors to the DNA in the stain. Dr. Baechetel also stated that he could not exclude Cribbs as a major contributor to the stain, i.e., that Cribbs' DNA constituted more of the total DNA than that of any other contributor, and he similarly could not exclude Rogers as a minor contributor. On cross-examination, Dr. Baechetel agreed that the source of DNA can be any number of bodily fluids. He also admitted that there was no way to determine what fluid other than blood was in this mixed stain, when the fluids in the mixed stain were deposited, which person's fluid was deposited first, or how many other potential contributors were associated with this stain.
At trial, Dr. Acton, the defense expert, generally concurred with Dr. Baechetel, agreeing that the methodology and testing methods were standard protocols and the PCR method of testing had less discriminatory power than other DNA tests. He testified that the mixed stain had the DNA of at least two contributors and neither Cribbs nor Rogers could be excluded. Dr. Acton further agreed with Dr. Baechetel that it was impossible to determine what biological fluid may have contributed to the mixed stain. However, unlike Dr. Baechetel, Dr. Acton did not believe it could be determined who was the major or minor contributor to the mixed stain.
In April 1997, the Office of the Inspector General issued an investigative report (OIG report) describing poor laboratory practices in several units at the FBI's crime lab.[15] The initial report was limited to three specific units within the lab, but additional research later revealed similar improprieties within the DNA unit. These supplementary findings regarding the DNA unit were presented to the Senate Judiciary Subcommittee on Administrative Oversight in September 1997.[16]
In summarily denying this claim, the trial court found:
The newly discovered evidence does not specifically address the work of Frank Samuel Baechetel. Furthermore, Dr. Baechetel's opinion simply stated that the victim could not be excluded as a contributor to a stain found on Defendant's shorts and that Defendant could not be excluded as a contributor to a stain found on Defendant's shorts. If this opinion was the sole basis for the conviction, then the Court would be more inclined to believe the outcome of the trial was tainted. However, the State provided substantial, competent other evidence to sustain the conviction. As such, there is no evidence that the outcome of the trial probably would have been different had this newly discovered evidence been introduced. Therefore, Defendant is not entitled to any relief on this claim.
(Transcript citation omitted.) Essentially, the trial court concluded that the newly discovered evidence did not specifically call into question the work of the State's expert; that the opinion of the State's expert did not conclusively establish that Rogers murdered Cribbs; and that the State expert's *552 testimony was not the sole basis for the conviction. Accordingly, the trial court concluded that introduction of the new evidence probably would not have changed the outcome. We agree.
For a conviction to be set aside based on newly discovered evidence, two requirements must be met: First, the trial court, the party, or counsel must not have known of the evidence at the time of trial, and it must appear that defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence "must be of such nature that it would probably produce an acquittal on retrial." Jones v. State, 709 So.2d 512, 521 (Fla.1998) (Jones II). Newly discovered evidence satisfies the second prong of the Jones II test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Id. at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)).
In determining whether the evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible." Jones v. State, 591 So.2d 911, 916 (Fla.1991) (Jones I). This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones II, 709 So.2d at 521 (citations omitted).
The first requirement under Jones II is that the evidence must be newly discovered, i.e., evidence that, at the time of trial, was not known and could not have become known by the use of due diligence. 709 So.2d at 521. The State does not contest this prong and we accept the lower court's conclusion that the evidence is newly discovered.
The second requirement under Jones II is that the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. Id. Because this portion of the test requires the Court to "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial," we must also discuss the remaining evidence of guilt produced at trial. Jones I, 591 So.2d at 916.
In addition to Dr. Baechetel's testimony concerning the results of the DNA testing of the mixed stain, the State presented substantial evidence implicating Rogers in the murder. Witnesses testified that Rogers was seen leaving a bar with Cribbs on the afternoon of the murder and that he was seen packing a white Ford Festiva, identified as Cribbs' automobile, at his motel that same evening. A motel clerk testified that after she saw Rogers packing the car, Rogers paid for an additional night and told the clerk not to allow housekeeping to enter his room. She also stated that she saw Rogers leave the motel in Cribbs' car the next morning. The cleaning crew found a handwritten "Do Not Disturb" sign hanging on the door of Rogers' motel room and then entered the room, discovering Cribbs' clothed body in the bathtub. Rogers' fingerprints were found on Cribbs' wallet, which was left at a highway rest stop near Tallahassee, and Rogers was apprehended in Cribbs' automobile in Kentucky.[17] Upon arrest, Rogers *553 claimed that he met a girl at a bar and brought her to his motel room, and that she loaned him the car. He stated that he left to get cigarettes and beer and never returned. He also told police that he could not tell them the truth. See Rogers, 783 So.2d at 985-86.
Rogers contends that when evaluated with the evidence described above, the information concerning the alleged improprieties at the FBI lab would probably produce an acquittal on retrial because this information vitiates the only evidence linking Rogers to the murder. This contention is not borne out by the record in this case.
First, nothing in the OIG report or related documents points to specific improprieties with the sample in this case or with Dr. Baechetel's practices in general. At most, the report calls into question the reliability of the lab overall and could have been used to impeach Dr. Baechetel's testimony as to the validity of the results.
Second, even if this Court were to conclude that the newly discovered evidence vitiates the DNA results, this is not the only piece of evidence connecting Rogers to the murder. Nothing presented calls into question the wealth of other circumstantial evidence supporting the conviction. Cf. Buenoano v. State, 708 So.2d 941, 951 (Fla.1998) (holding that although the OIG report was newly discovered, it was "not of such a nature that it would probably produce a different result on retrial," because there was "ample evidence to show beyond a reasonable doubt that Buenoano committed the murder"). Because Rogers has failed to demonstrate that the newly discovered evidence would probably produce an acquittal on retrial, we affirm the denial of relief on this claim.
4. Cumulative Error
In the final issue of his postconviction appeal, Rogers argues that multiple errors, viewed cumulatively, mandate a new trial.[18] It is appropriate to evaluate claims of error cumulatively to determine if the errors collectively warrant a new trial. See, e.g., Suggs v. State, 923 So.2d 419, 441-42 (Fla.2005). However, in this claim, Rogers attempts to combine claims that were raised on direct appeal with claims of ineffective assistance of counsel and newly discovered evidence that were raised in his motion for postconviction relief.
First, the alleged prosecutorial misconduct that Rogers raised on direct appealthe warrantless search of the cells of Rogers and other inmates and the introduction during the penalty phase of evidence of a prior misdemeanor assault committed by Rogerswere rejected by this Court. Rogers cannot relitigate these issues in his postconviction motion. See Rodriguez v. State, 919 So.2d 1252, 1262 n. 7 (Fla.2005) (holding that claims that are raised on direct appeal and rejected are procedurally barred from collateral attack in a postconviction motion).
*554 Second, we have already concluded that counsel was not ineffective for failing to develop an alternative suspect or failing to object to the State's guilt and penalty-phase closing arguments, and we have analyzed the claims of prosecutorial misconduct and newly discovered evidence regarding the FBI's DNA unit and determined that they were likewise without merit. Because each of Rogers' individual claims is either procedurally barred or without merit, his cumulative error claim must fail. See, e.g., Parker v. State, 904 So.2d 370, 380 (Fla.2005) ("[W]here the individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error also necessarily fails.").

B. PETITION FOR WRIT OF HABEAS CORPUS
1. Ineffective Assistance of Appellate Counsel
In his first habeas claim, Rogers contends that appellate counsel provided ineffective assistance by failing to argue on direct appeal that Florida's death sentencing statute is unconstitutional as applied under the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Of course, Ring was decided after the appeal in this case and appellate counsel was not ineffective for failing to anticipate the Supreme Court's decision in that case. Further, Rogers' argument that appellate counsel failed to argue the unconstitutionality of the sentence based on the failure of the indictment to allege aggravating circumstances is without merit. This Court has consistently held that neither Apprendi nor Ring requires that aggravating circumstances be charged in the indictment. See Parker, 904 So.2d at 383; Blackwelder v. State, 851 So.2d 650, 654 (Fla.2003).
Additionally, Rogers' argument that appellate counsel was ineffective for failing to argue that none of the statutory aggravators was individually found by a unanimous jury is equally without merit. The jury recommended that Rogers be sentenced to death by a unanimous vote; accordingly, any claim of unconstitutionality would have been rejected on direct appeal. See, e.g., Crain v. State, 894 So.2d 59, 78 (Fla.2004). Because neither argument has merit, we deny relief. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) (holding that appellate counsel cannot be deemed ineffective for failing to raise a meritless argument on direct appeal).
2. Constitutionality of Section 921.141(5)
In his second habeas claim, Rogers asserts that section 921.141(5), Florida Statutes (2005), Florida's death sentencing statute, is unconstitutional because it authorizes the use of an underlying felony as an aggravator supporting the death sentence and improperly shifts the burden of proof to the defendant to prove that the death penalty is not the appropriate penalty.[19] His claim is without merit.
First, this Court has consistently rejected claims that "the aggravating circumstance that the murder was committed in the course of committing a specified felony is unconstitutional because it constitutes an automatic aggravator and does not narrow *555 the class of persons eligible for the death penalty." Arbelaez v. State, 898 So.2d 25, 46-47 (Fla.2005) (quoting Ault v. State, 866 So.2d 674, 686 (Fla.2003)); see also Blanco v. State, 706 So.2d 7, 11 (Fla. 1997). Second, we have held that the standard penalty-phase jury instructions do not "impermissibly shift the burden to the defense to prove that death is not the appropriate sentence." Taylor v. State, 937 So.2d 590, 599 (Fla.2006) (citing Elledge v. State, 911 So.2d 57, 79 (Fla.2005), and Sweet v. Moore, 822 So.2d 1269, 1274 (Fla.2002)). Third, the United States Supreme Court recently re-iterated that it is not improper for a statute to require the defendant to offer "mitigating circumstances sufficiently substantial to call for leniency." Kansas v. Marsh, ___ U.S. ___, ___, 126 S.Ct. 2516, 2523, 165 L.Ed.2d 429 (2006) (quoting Walton v. Arizona, 497 U.S. 639, 650, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)). Therefore, Rogers is not entitled to relief on this claim.
3. Cumulative Error
In his third habeas claim, Rogers contends that the multitude of errors, viewed cumulatively, demonstrates that he was deprived of a fundamentally fair trial in violation of the United States Constitution. This claim appears to be a reiteration of his postconviction motion cumulative error claim with the addition of one ineffective assistance of appellate counsel claim. Specifically, Rogers claims that the following errors establish that he did not receive a fair trial: (1) the introduction of evidence of a prior misdemeanor assault; (2) the trial court's failure to grant a mistrial after improperly allowing the introduction of the prior misdemeanor assault in front of the jury; (3) the prosecutor making the "Desert Storm" comment during closing argument of the penalty phase; and (4) appellate counsel's ineffectiveness in failing to research caselaw and argue on direct appeal that the jury should have been instructed on the statutory mitigator of being under the influence of extreme mental or emotional disturbance based upon all the evidence in the record. Because each of these alleged errors is either procedurally barred, without merit, or insufficient alone to justify a reversal, we deny relief on this claim.
On direct appeal, Justice Anstead, joined by Justice Pariente, dissented from the majority's affirmance of the death sentence, stating:
I agree with the majority that the prosecutor's single, unobjected-to Desert Storm argument, while error, would ordinarily not amount to fundamental error. However, this case presents a unique situation where we have already expressly found this same argument to be a flagrant error in another capital case. Further, when this improper argument is considered along with the fact that the defense was denied the benefit of a PET scan, and the jury heard improper but inflammatory evidence of other crimes Rogers committed, the error further demonstrates why these other substantial errors could not possibly be harmless. Indeed, it is impossible for this Court to conclude that the jury's decision to recommend death was not affected by these three serious errors.
Rogers, 783 So.2d at 1009 (Anstead, J., concurring in part and dissenting in part). However, the majority rejected this view and concluded that any error regarding the "Desert Storm" comment and the introduction of the prior misdemeanor assault testimony did not warrant reversal of Rogers' conviction or death sentence. Because we previously found each of these claims to be without merit on direct appeal, they cannot be raised in this habeas petition or combined to create a valid cumulative error claim. See Morris, 931 *556 So.2d at 837 n. 14 (concluding that claims that were rejected by the Court on direct appeal are barred from being relitigated in a habeas petition); see also Melendez v. State, 718 So.2d 746, 749 (Fla.1998) (concluding that a claim that was rejected in a postconviction motion is procedurally barred from being raised in a habeas petition).
Rogers' final subclaim of alleged cumulative error is that appellate counsel provided ineffective assistance by failing to argue on direct appeal that the trial court erred in failing to give an instruction regarding the statutory mitigator of the influence of extreme mental or emotional disturbance. Specifically, Rogers argues that appellate counsel was ineffective for failing to research the law and cite cases, such as Smith v. State, 492 So.2d 1063 (Fla.1986), to support the contention that the trial court erred in failing to instruct the jury on the influence of extreme mental or emotional disturbance because Rogers had consumed alcohol on the day of the murder. However, appellate counsel raised this issue and cited several cases to support Rogers' assertion that the trial court erred in failing to consider, find, and instruct the jury on this statutory mitigator. Because this issue was adequately raised on direct appeal, appellate counsel did not provide ineffective assistance. Therefore, we deny relief on this cumulative error claim.
4. Incompetency at Time of Execution
In his final habeas claim, Rogers asserts that his Eighth Amendment rights will be violated because he may be incompetent at the time of execution. As we have previously held, this claim is not ripe for review until a death warrant has been issued, which has not occurred in this case. See Griffin v. State, 866 So.2d 1, 21-22 (Fla.2003). Therefore, we deny relief on this claim.

CONCLUSION
For the reasons stated above, we affirm the trial court's denial of Rogers' motion for postconviction relief and deny Rogers' petition for a writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] In our decision on direct appeal we stated that the blood-stained blue jean shorts were found in the motel bathroom and that a pair of blood-stained blue jeans were found in Cribbs' car. See Rogers v. State, 783 So.2d 980, 986 (Fla. 2001). Although the location of the evidence is not material to the issues raised on direct appeal or in this postconviction motion, we note that the pair of blood-stained blue jean shorts was found in Cribbs' car and a pair of blood-stained black, as opposed to blue, jeans was found in the motel room.
[2] The trial court found two aggravating circumstances: (1) that the murder was committed for pecuniary gain; and (2) that the murder was especially heinous, atrocious, or cruel ("HAC"). The trial court also found one statutory mitigating circumstancethat Rogers' capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (some weight)and the following nonstatutory mitigating circumstances: (1) Rogers had a childhood deprived of love, affection, and moral guidance, and lacked a moral upbringing of good family values (slight weight); (2) Rogers' father was an alcoholic who physically abused Rogers' mother in the presence of Rogers and his siblings (slight weight); (3) Rogers was introduced to controlled substances at a young age and encouraged by his older brother to participate in burglaries (slight weight); (4) Rogers has been lawfully and gainfully employed at various times in his adult life (slight weight); (5) Rogers was solely responsible for the care of his two children at one time in his adult life (slight weight); and (6) Rogers had been drinking alcohol for a few hours on the day he came into contact with the victim (little weight). Rogers, 783 So.2d at 987.
[3] These issues were: (1) whether the trial court should have granted the motion for acquittal because the State failed to present sufficient evidence to support premeditated or felony murder; (2) whether the evidence supported the pecuniary gain or HAC aggravators; (3) whether the trial court should have given the statutory mental mitigating circumstances at least great or significant weight and should have found the mitigating circumstance that the murder was committed while "under the influence of extreme mental or emotional disturbance," § 921.141, Fla. Stat. (1995); (4) whether the trial court erred when it failed to consider and appropriately weigh all mitigating circumstances as required by Campbell v. State, 571 So.2d 415 (Fla.1990); (5) whether the trial court should have allowed Rogers to obtain a Positron Emission Tomography Scan (PET-Scan); (6) whether the trial court should have granted the defense's motion for mistrial after testimony concerning a prior criminal misdemeanor conviction in California was heard during the penalty phase; (7) whether the trial court should have declared a mistrial because the prosecutor made improper comments during the State's penalty-phase closing argument; (8) whether the trial court should have granted Rogers' motion to disqualify the state attorney's office; (9) whether the trial court should have granted Rogers' motion for a new trial due to newly discovered evidence; and (10) whether the death sentence is a disproportionate penalty in this case. Rogers, 783 So.2d at 987 n. 2.
[4] Rogers raised the following seven claims in his postconviction motion: (1) ineffective assistance of trial counsel for failing to investigate and develop an alternative suspect; (2) newly discovered evidence regarding alleged improprieties at the lab that performed the DNA analysis; (3) ineffective assistance of trial counsel for failing to object to improper prosecutorial comments during closing argument of the guilt phase; (4) ineffective assistance of trial counsel for failing to object to improper prosecutorial comments during closing argument of the penalty phase; (5) unconstitutionality of Florida's death sentencing statute; (6) ineffective assistance of trial counsel for failing to pursue a claim that Florida's death sentencing statute is facially vague and overbroad, and is premised on fundamental error; and (7) cumulative error for the "procedural and substantive errors" and appellate counsel's failure to litigate these errors on appeal.
[5] Huff v. State, 622 So.2d 982 (Fla.1993).
[6] These issues are: (1) whether the circuit court erred in denying Rogers' claim that counsel was ineffective during the guilt phase for failing to develop an alternative suspect; (2) whether the circuit court erred in concluding that although the impropriety of the FBI lab was newly discovered evidence, the outcome of a new trial would not have been different; (3) whether the circuit court erred in denying an evidentiary hearing on Rogers' claim that counsel was ineffective during the guilt phase for failing to object to improper prosecutorial comments during closing argument; (4) whether the circuit court erred in denying Rogers' claim that counsel was ineffective during the penalty phase for failing to object to improper prosecutorial comments during closing argument; and (5) whether, cumulatively, the combination of "procedural and substantive errors," which appellate counsel failed to effectively litigate on appeal, deprived Rogers of a fundamentally fair trial.
[7] These issues are: (1) whether appellate counsel was ineffective for failing to argue that the Florida death sentencing statute as applied violates the United States Constitution under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (2) whether section 921.141(5), Florida Statutes (2005), is facially vague and overbroad in violation of the Eighth and Fourteenth Amendments, whether such unconstitutionality is reversible error because the jury did not receive adequate guidance in violation of the Eighth and Fourteenth Amendments, whether Rogers' death sentence is premised on fundamental error which must be corrected, and whether trial counsel was ineffective for failing to litigate these issues; (3) whether, cumulatively, the combination of procedural and substantive errors deprived Rogers of a fundamentally fair trial and whether appellate counsel was ineffective for failing to litigate these issues on appeal; and (4) whether Rogers' Eighth Amendment right against cruel and unusual punishment will be violated as he may be incompetent at the time of execution.
[8] Monteverdi testified that he and Lundin were discussing Rogers' case in prison and Monteverdi believed the statement meant Lundin killed Cribbs.
[9] Attorney Sinardi recalled that the depth and location of the wounds were similar, but the victim's body in Lundin's trial was too decomposed to allege any significant similarities.
[10] Monteverdi was serving a fifteen-year prison sentence for multiple forgeries, burglaries, and grand theft.
[11] A confidential informant notified prosecutors of an alleged conspiracy, whereby Lundin, Rogers and several others would frame Lundin for the murder because he had already received the death penalty for a different murder.
[12] Here, there is no factual dispute as to what each attorney said during their respective closing arguments; thus, the trial court did not err when it reviewed the record, made a legal determination that the comments were proper, and denied the claim without holding an evidentiary hearing.
[13] Unlike the claim related to the State's guilt-phase closing argument, the trial court held an evidentiary hearing on whether trial counsel was ineffective by failing to object during the State's penalty-phase closing argument.
[14] Rogers asserts that our holding in Ruiz v. State, 743 So.2d 1 (Fla.1999), requires reversal of his death sentence. In Ruiz, we condemned Cox's use of this identical comment during closing argument and reversed Ruiz's sentence based on this argument and the existence of a multitude of other improper comments and prosecutorial overreaching. 743 So.2d at 6-7. Although we agree that the comment was improper, this case is not like Ruiz, in which the prosecutor made several improper comments which compromised "the integrity of the judicial process" and irreparably tainted the sentence. Id. at 7.
[15] Office of the Inspector General, U.S. Dep't of Justice, The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases (1997), available at http://www.usdoj.gov/oig/special/9704a/.
[16] Although the improprieties addressed technician incompetence, inaccurate record-keeping, and the fabrication of test results, neither the test results in this case nor the expert who testified for the State were specifically identified within this newly discovered evidence.
[17] Several other pieces of evidence were found in Cribbs automobile, including the key to the motel room where Cribbs' body was found, a bloodstained T-shirt, a cooler and duffel bag, and the jean shorts containing the mixed stain discussed above.
[18] Specifically, Rogers asserts that the following errors justify a reversal: (1) trial counsel failed to develop an alternative suspect; (2) newly discovered evidence exists establishing improprieties at the FBI lab; (3) the State conducted a warrantless search of the cells of Rogers and other inmates in an effort to hinder Rogers' defense; (4) the State took a sworn statement from a defense witness without notifying defense counsel; (5) the State threatened a witness with perjury unless he changed his testimony; (6) trial counsel failed to object to the State denigrating defense witnesses during closing arguments; (7) trial counsel failed to object to the State bolstering witnesses during closing arguments; (8) trial counsel failed to object to the "Desert Storm" argument; and (9) the State attempted to introduce evidence of a nonstatutory aggravator, which necessitated a curative instruction.
[19] Rogers further contends that defense counsel provided ineffective assistance by failing to object on these grounds at trial. To the extent that Rogers is alleging ineffective assistance of trial counsel, we reject this claim because it is not appropriately raised in a petition for writ of habeas corpus. See Reed v. State, 875 So.2d 415, 439-40 (Fla.2004).