# Supreme Court of Florida

————————

No. SC2023-1298

————————

**MICHAEL JAMES JACKSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 18, 2025
**<u>CORRECTED OPINION</u>**

PER CURIAM.

Michael James Jackson and three codefendants robbed, kidnapped, and ultimately murdered James and Carol Sumner, a frail couple in ill health, by burying them alive in 2005. Jackson was convicted of these crimes in 2007 and, for each murder, was originally sentenced to death after the trial judge followed the jury's 8-4 advisory recommendation of death.

Jackson's death sentences were vacated in 2017 based on this Court's holding in *Hurst v. State*, 202 So. 3d 40, 44 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020),

"that in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous." In the wake of *Hurst*, the legislature amended section 921.141, Florida Statutes, to provide that, among other things, a sentence of death in a jury trial could only be imposed based on a unanimous jury recommendation of death. *See* ch. 2017-1, § 1, Laws of Fla.

For various reasons, Jackson's resentencing did not take place until May 2023. By that time, *Hurst*'s relevant holding and the corresponding amendment to section 921.141 were no longer in effect. Rather, in 2020, *Poole* receded from *Hurst*'s requirement that a jury unanimously recommend death. *See* 297 So. 3d at 491. And in early 2023—after a nonunanimous jury recommendation of death in a school-shooting case resulted in a life sentence for that defendant, Nikolas Cruz—the legislature amended section 921.141 to provide that a trial court may impose a sentence of death based on the recommendation of eight or more jurors. *See* ch. 2023-23, § 1, Laws of Fla.

The 2023 amendments to section 921.141 went into effect prior to and were applied at Jackson's resentencing. There, the jury

again returned 8-4 recommendations of death for each murder, and the trial court again imposed two death sentences.

Jackson now appeals, raising fourteen issues, many of which focus on the 2023 amendments to section 921.141. We have jurisdiction, *see* art. V, § 3(b)(1), Fla. Const., and affirm.

## I. BACKGROUND

### A. Guilt Phase and Initial Penalty Phase

The evidence presented at Jackson's guilt phase was recounted in our decision on initial direct appeal. *See Jackson v. State*, 18 So. 3d 1016, 1020-23 (Fla. 2009). In short, "[i]n July of 2005, Jackson and codefendants Tiffany Ann Cole, Bruce Kent Nixon, Jr., and Alan Lyndell Wade robbed, kidnapped, and murdered James and Carol Sumner." *Id.* at 1020. They did so after "the Sumners allowed Cole and Jackson to stay with them in their Jacksonville home." *Id.* While staying with the Sumners, Jackson noticed they were "frail and would be easy victims," and he "informed Wade of the Sumners' financial position, which included $90,000 from the sale of their South Carolina home." *Id.* Jackson, Wade, and Cole hatched a scheme, and Wade invited Nixon to join them. *Id.* at 1021. "At the time of the crimes, Wade and Nixon were

- 3 -

eighteen years old, and Jackson and Cole were twenty-three years old." *Id.*

Days before the murders, and in preparation therefor, Jackson, Wade, and Nixon dug "a six-foot-deep hole in a remote area of Georgia." *Id.* Then, on the evening of July 8, 2005, after Carol Sumner allowed Wade and Nixon to enter her house, Wade and Nixon held the Sumners at "gunpoint" using a "toy gun" and bound them with duct tape. *Id.* Jackson then entered the home "and began searching for bank statements and automated-teller-machine (ATM) cards." *Id.* Wade and Nixon later "ordered the victims to climb into the trunk of the Sumners' Lincoln Town Car." *Id.* With the Sumners "trapped in the trunk of the vehicle," the codefendants drove that and another vehicle to the Georgia gravesite. *Id.*

At the gravesite, the Sumners "were placed in the deep hole," *id.* at 1022, and "buried alive," *id.* at 1023. Over the next several days, Jackson was captured by "[p]hoto surveillance . . . using the Sumner ATM card several times." *Id.* at 1022. Jackson also impersonated James Sumner during telephone calls with the bank and the Jacksonville Sheriff's Office. *Id.* Ultimately, Jackson, Cole,

and Wade were arrested in South Carolina. *Id.* at 1023. Nixon, who was also arrested, "revealed the burial location," *id.*, entered into a plea agreement, and testified at Jackson's trial, *id.* at 1021 & n.2. Among other things, Nixon testified that "Jackson was in charge." *Id.* at 1021.

For his part, Jackson, both to investigators and at trial, attempted to pin the kidnapping and murders on Wade and Nixon. *Id.* at 1023. But the jury convicted Jackson on all counts, including two counts of first-degree murder. *Id.* at 1020, 1023.

In Jackson's initial penalty phase, he declined to present mitigation, and the jury "recommended death sentences for the murders of both victims by votes of eight to four." *Id.* at 1024. The trial court imposed a death sentence for each murder after finding eight aggravating factors and concluding that, among other things, the aggravators "far outweighed" one "statutory" mitigator (age) and three "nonstatutory" mitigating circumstances. *Id.*

This Court affirmed Jackson's convictions and sentences on direct appeal. *Id.* at 1036.

**B. Initial Postconviction Motion; Jackson's Concessions**

Jackson sought postconviction relief under Florida Rule of

- 5 -

Criminal Procedure 3.851. In 2011, while his motion was pending, Jackson returned to court to waive all guilt-related issues and to acknowledge that the crimes were his idea and that he "was, in fact, the leader." *Jackson v. State,* 127 So. 3d 447, 456, 458-59 (Fla. 2013). The postconviction court later denied Jackson's claims. *Id.* at 459. This Court affirmed the denial of postconviction relief and denied Jackson's petition for writ of habeas corpus. *Id.* at 477.

## C. Successive Postconviction Motion—*Hurst* and *Poole*

After this Court decided *Hurst,* "Jackson filed a successive postconviction motion seeking *Hurst* relief. The postconviction court granted Jackson a new penalty phase, and the State did not appeal the order granting relief." *State v. Jackson,* 306 So. 3d 936, 938 (Fla. 2020). The order granting Jackson a new penalty phase was issued in June 2017.

In early 2020, when *Poole* receded from *Hurst*'s unanimous-recommendation requirement, Jackson's new penalty phase had not yet begun. *Id.* at 938-39. Seeking to apply *Poole* to Jackson's case, the State moved the circuit court to dismiss Jackson's resentencing and maintain his death sentences. *Id.* After the circuit court denied the State's motion, the State petitioned this

Court to direct the circuit court to reinstate Jackson's death sentences. *Id.* at 937, 939. This Court denied the State's petition, concluding that "Jackson's vacated death sentences [could not] be retroactively reinstated." *Id.* at 945.

### D. Jackson's 2023 Resentencing

Jackson's resentencing took place in 2023, after the 2023 amendments to section 921.141 went into effect. Days after the effective date of the 2023 amendments, Jackson filed a "Motion to Continue, or in the Alternative, Motion to Proceed Under the Unanimity Law," asserting that the statutory changes "raise[d] multiple objectionable issues." Jackson later filed additional motions raising numerous legal arguments against applying the new statute. His arguments included: res judicata; laches; Eighth Amendment arbitrariness; bill of attainder; equal protection; lack of adequate safeguards; proportionality; lack of unanimity rendering Florida as an extreme outlier; evolving standards of decency; that the new statute violates *Caldwell v. Mississippi*, 472 U.S. 320 (1985); Sixth Amendment right to unanimity; that section 775.022(3), Florida Statutes, required the 2023 amendments to be applied prospectively; and that text messages between his lead

prosecutor and a state representative sent during the enactment of the 2023 amendments precluded the new statute from applying.

The judge, after holding hearings, denied Jackson's motions, concluding that the 2023 amendments applied to the new penalty phase. The case then proceeded to jury selection.

During the new penalty phase, the State sought to prove, for each murder, the same eight aggravators from the initial penalty phase. In furtherance thereof, the State presented testimony from certain individuals, including codefendant Nixon's perpetuated testimony from Jackson's 2007 trial (Nixon refused to testify at Jackson's resentencing). For his part, Jackson presented the testimony of family members, friends, character witnesses, and defense experts. In doing so, Jackson proposed twenty-five mitigating circumstances, almost all of which (except age) would be considered "nonstatutory." *See* § 921.141(7)(h), Fla. Stat.

For each murder, the jury unanimously found all eight aggravators proven beyond a reasonable doubt. After conducting the weighing process involving the proven aggravators and the mitigating circumstances found to exist, the jury returned an 8-4 recommendation of death for each murder.

- 8 -

The circuit court followed the jury's recommendations and sentenced Jackson to death for each murder. In doing so, the court found all eight aggravators found by the jury, assigning weight as follows: (1) Jackson was previously convicted of a felony and was on felony probation at the time of the first-degree murder (great weight); (2) Jackson was convicted of another capital felony prior to this proceeding (based on the contemporaneous murder) (great weight); (3) the first-degree murder was committed while Jackson was engaged in the commission of any kidnapping (great weight); (4) the first-degree murder was committed for the purpose of avoiding or preventing a lawful arrest (great weight); (5) the first-degree murder was committed for financial gain (great weight); (6) the first-degree murder was especially heinous, atrocious, or cruel (HAC) (very great weight); (7) the first-degree murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (very great weight); and (8) the victim was particularly vulnerable due to advanced age or disability (very great weight).

The court also found each proposed mitigating circumstance was established, assigning weight as follows: (1) Jackson was

prenatally exposed to drugs and alcohol (little weight); (2) Jackson suffers from neurological deficits relating to prenatal exposure (little weight); (3) Jackson experienced physical neglect beginning in infancy (little weight); (4) Jackson was abandoned by his mother at an early age (little weight); (5) Jackson's mother promised to visit at various times before age 11 but never followed through (no weight); (6) Jackson has never known his father (little weight); (7) Jackson's grandfather resented having to raise him (little weight); (8) Jackson has impaired social skills (no weight); (9) Jackson was bullied as a child (little weight); (10) At age 12, Jackson's grandparents separated. Jackson and his grandmother moved to Boulder Bluff, where there were more negative influences. This move also took him away from Stephanie Stewart and her family (some weight); (11) Jackson's bad behavior escalated after the move to Boulder Bluff (little weight); (12) Jackson was exposed to domestic violence in the home of his aunt (little weight); (13) Jackson's mother, aunt, and uncle were substance abusers (little weight); (14) Jackson's uncle, with whom he spent a great deal of time, is mentally ill and has been institutionalized (little weight); (15) Jackson was treated for Attention Deficit Hyperactivity Disorder (ADHD) off and on during

childhood (little weight); (16) Due to Jackson's hyperactivity, a cardboard box was placed around his desk during class at age 9 (little weight); (17) Jackson was held back in third and sixth grades (little weight); (18) A psychoeducational evaluation was never performed on Jackson, despite being recommended (no weight); (19) Jackson has found God and devoted his life to religious study, earning many certificates for discipleship (little weight); (20) Jackson accepts responsibility for his actions and has voluntarily waived appeals relating to his guilt (some weight); (21) Jackson was 23 years old at the time of the offense (little weight); (22) Jackson has recently formed a relationship with his sister, Melissa Russell (no weight); (23) Jackson is very important to his grandmother, Dimples Inabinet, who considers him to be her son (little weight); (24) Jackson has expressed a desire to teach others about God (no weight); and (25) Jackson has been diagnosed with Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure (ND-PAE), which is a diagnosis under the Fetal Alcohol Spectrum Disorder (FASD) umbrella, as well as Traumatic Brain Injury, Conduct Disorder, Separation Anxiety Disorder, and Attention Deficit Disorder (some weight).

After independently weighing the aggravating factors against the mitigating circumstances, the court "wholly agree[d] with the jury's recommendation." In the end, the court found that "the aggravating factors heavily outweigh the mitigating circumstances and that death is the only proper penalty for the murders."

This appeal followed.

## II. APPEAL

Jackson raises fourteen issues, many of which target the 2023 amendments to section 921.141. We begin our analysis by reviewing certain statutory (and decisional law) changes, including the 2023 amendments, that occurred between the time of Jackson's crimes and his resentencing. We then explain why none of Jackson's issues (or sub-issues) warrant a new penalty phase. In addressing Jackson's issues, we first address those targeting the 2023 amendments and then address those alleging errors at his resentencing proceeding.

### A. Legal Landscape

At the time of Jackson's crimes and initial penalty phase, section 921.141 authorized a jury, based on a majority vote (7-5), to recommend an advisory sentence of either life imprisonment or

death.  *See* ch. 96-302, § 1, Laws of Fla.  The statute also permitted the trial court to override either recommendation.  Florida's then capital sentencing scheme was later deemed by the United States Supreme Court to be unconstitutional on the ground that the scheme, in violation of the Sixth Amendment, "required the judge alone to find the existence of an aggravating circumstance" "that is necessary for imposition of the death penalty."  *Hurst v. Florida*, 577 U.S. 92, 102, 103 (2016).

In the wake of that Supreme Court decision, the legislature amended section 921.141 to correct the constitutional infirmity by providing that the jury must unanimously find the existence of at least one aggravator to render the defendant eligible for a sentence of death.  *See* ch. 2016-13, § 3, Laws of Fla.  The legislature also provided that a sentence of death could only be imposed based on a recommendation of ten or more jurors, and that if fewer than ten jurors recommend death, then the jury's recommendation shall be for a life sentence.  Moreover, the legislature provided that the court could continue to override a recommendation of death but could no longer override a recommendation of life.  *See id.*

A few months after those legislative changes, this Court announced holdings that went well beyond the Supreme Court's decision. Of relevance, this Court held that the Sixth and Eighth Amendments require a jury to unanimously recommend a sentence of death. *See Hurst*, 202 So. 3d at 59-60. Following *Hurst*, the legislature unsurprisingly amended section 921.141 to provide that a sentence of death could only be imposed based on a unanimous jury recommendation. *See* ch. 2017-1, § 1, Laws of Fla.

In 2020, *Poole* recognized the errors in and receded from most of *Hurst*, including its unanimous-recommendation holdings. *See* 297 So. 3d at 491, 504-05. The legislature initially left section 921.141 unchanged after *Poole*. But in early 2023, months after the jury in the Parkland shooting case returned a nonunanimous death recommendation for that defendant (Nikolas Cruz), the legislature amended section 921.141 to allow a judge to impose a sentence of death upon the recommendation of eight or more jurors, and to provide that if fewer than eight jurors recommend death, then the jury's recommendation must be for a life sentence. *See* ch. 2023-23, § 1, Laws of Fla. The legislature left in place the judge's ability to override only a recommendation of death.

As noted earlier, the 2023 amendments went into effect prior to and were applied at Jackson's resentencing.

### B.  Challenges to the 2023 Amendments

In his initial brief, Jackson raises six issues (with some sub-issues) targeting the 2023 amendments themselves or their application at his second penalty phase.  Each one fails.

### 1.

Jackson attacks the statute's nonunanimity (8-4) provision on four grounds.  Jackson's attacks are inadequately briefed, foreclosed by precedent, and/or otherwise without merit.

### a.

Jackson first asserts that "non-unanimous verdicts allow a jury to make a decision without the agreement of members in the minority" and that "[t]his creates a breeding ground for racial discrimination in conflict with the Fourteenth Amendment's guarantee of equal protection and the Eighth Amendment's guarantee of capital verdicts uninfected by racial discrimination." Jackson references the racial composition of his jury but insists that his challenge to the statute "is facial, not as applied."  In support of his claim that there is no set of circumstances in which

the statute can be constitutionally applied, Jackson points to the legislative record of the 2023 amendments. He offers citations where, for example, certain witnesses or representatives opined that the Supreme Court's decision in *Ramos v. Louisiana*, 590 U.S. 83 (2020), undermines *Poole*, or suggested that nonunanimity might negatively impact the Black community. Jackson also notes that certain legislators and witnesses used the label "rogue" or "activist" to describe a juror who disclosed her vote for a life sentence for Nikolas Cruz, the defendant in the Parkland shooting case.

Jackson's attack—grounded in the Eighth Amendment and in equal protection—largely relies on *Ramos*, which acknowledged that some laws permitting nonunanimous verdicts were designed to dilute the influence of African-American jurors. 590 U.S. at 88. But *Ramos* involved the Sixth Amendment and "nonunanimous convictions," *id.* at 87, not the Eighth Amendment, equal protection, or the selection phase of a capital trial. Indeed, the question *Ramos* answered in the affirmative was "whether the Sixth Amendment . . . requires a unanimous verdict to convict a defendant of a serious offense." *Id.* at 88; *see also id.* at 114 (Sotomayor, J., concurring in part) ("Ramos does not bring an equal protection challenge . . . .").

In the end, Jackson's Eighth Amendment claim fails under existing precedent recognizing that "the Eighth Amendment does not require a jury's favorable recommendation before a death penalty can be imposed." *Poole*, 297 So. 3d at 505 (citing *Spaziano v. Florida*, 468 U.S. 447, 464-65 (1984)). Jackson does not explain how a statute requiring eight or more jurors to recommend a death sentence can facially violate a constitutional provision that itself does not require a jury recommendation of death.

As far as equal protection, the State answers that Jackson "appears to raise a Fourteenth Amendment disparate-impact claim" under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Jackson cites *Arlington Heights*, but not until his reply brief. Putting aside the imprecise briefing, Jackson's challenge fails. *Arlington Heights* stands for the proposition that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 265. Jackson comes nowhere close to "proving" a racially discriminatory intent or purpose motivated the decision to abandon unanimity.

- 17 -

## b.

Second, Jackson launches an Eighth Amendment "evolving standards of decency" attack on nonunanimity.  But as *Poole* explained, we are bound by *Spaziano*'s "hold[ing] that the Eighth Amendment does not require a jury's favorable recommendation before a death penalty can be imposed."  *Poole*, 297 So. 3d at 505.  Jackson's argument regarding evolving standards is thus "irrelevant."  *Id.* at 509 (Lawson, J., concurring specially).

## c.

Third, Jackson asserts that section 921.141 violates the Sixth Amendment and *Hurst v. Florida* by not requiring jury unanimity on the "finding" of whether the aggravators outweigh the mitigating circumstances found to exist.  *See* § 921.141(2)(b)2.b., Fla. Stat.  This argument also runs up against *Poole*, which, relying on Supreme Court precedent, held that the weighing "finding" in section 921.141 is a "selection finding" and "not a 'fact'" for purposes of the Sixth Amendment.  297 So. 3d at 503.

## d.

Fourth, Jackson briefly asserts "[i]n the alternative" that "the Sixth Amendment jury right the framers understood included a

right to unanimity for life and death decisions." This attack also fails. *See Poole*, 297 So. 3d at 504 ("[T]he Sixth Amendment, as interpreted in *Spaziano*, does not require any jury recommendation of death, much less a unanimous one.").

**2.**

Jackson claims that section 775.022(3), enacted in 2019, barred the "retrospective application of the 2023 amendment to Florida's capital sentencing statute." We reject this claim.

Section 775.022(3) provides in relevant part that, subject to exceptions, "the reenactment or amendment of a criminal statute operates prospectively." Section 775.022(2) defines "criminal statute" as "a statute, whether substantive or procedural, dealing in any way with a crime or its punishment, defining a crime or a defense to a crime, or providing for the punishment of a crime." The parties seemingly agree that the 2023 amendments were procedural and fall within the definition of "criminal statute." They disagree as to whether the 2023 amendments were applied "prospectively" or "retroactively."[1] The State gets it right.

_____

1. In a pretrial motion filed May 12, 2023, and in argument to the court on May 15, 2023, Jackson focused solely on the statutory

In *Love v. State*, 286 So. 3d 177 (Fla. 2019), we explained that "whether a new procedural statute applies in a pending case will generally turn on the posture of the case" and that "if the new procedure does apply, that is not in and of itself a retrospective operation of the statute." *Id.* at 187. *Love* held that procedural changes altering the burden of proof at pretrial immunity hearings under Florida's "Stand Your Ground" law applied to pending cases in which the "immunity hearings . . . take place on or after the statute's effective date." *Id.* at 188. Doing so was "essentially, giving the statute prospective application." *Id.* Here, we conclude that applying section 921.141's procedural changes to a *Hurst* resentencing that began after the amendments went into effect, for crimes that occurred in 2005, was similarly a "prospective

---

term "prospectively." Similarly, in his initial brief, Jackson argues that the 2023 amendment was impermissibly applied "retroactively to a resentencing . . . for a crime that occurred in 2005." But in his reply brief, Jackson shifts the focus of his argument to other statutory language, namely that "the reenactment or amendment of a criminal statute . . . does not affect or abate . . . [t]he prior operation of the statute or a prosecution or enforcement thereunder." § 775.022(3)(a), Fla. Stat. This is improper. And we are hardly persuaded by Jackson's argument that the 2017 version of section 921.141 had "prior operation" in his case.

application"—one that thus did not run afoul of section 775.022(3).

**3.**

Jackson advances a res judicata claim, the gist of which is that the 2017 order granting *Hurst* relief was a "final judgment" that "imposed a duty on the trial court to hold a resentencing that applied *Hurst v. State*."[2]  Not so.

"The doctrine of res judicata bars relitigation in a subsequent cause of action not only of claims raised, but also claims that could have been raised."  *Topps v. State*, 865 So. 2d 1253, 1255 (Fla. 2004) (citing *Fla. Dep't of Transp. v. Juliano*, 801 So. 2d 101, 107 (Fla. 2001)).  Here, the 2017 order did no more than confirm that, under the decisional law at the time, Jackson was entitled to resentencing.

Even if the 2017 order contemplated *Hurst*-compliant procedures at resentencing, res judicata is still inapplicable.  The

---

2.  The State suggests Jackson's arguments "more aptly sound under the law-of-the-case doctrine."  But that doctrine "do[es] not apply unless the issues are decided *on appeal*."  *State v. McBride*, 848 So. 2d 287, 290 (Fla. 2003) (citing *Fla. Dep't of Transp. v. Juliano*, 801 So. 2d 101, 105 (Fla. 2001)).  The 2017 order granting *Hurst* relief was never appealed.

doctrine is subject to exceptions, including that it yields to intervening changes in the law. *C.f. Thompson v. Thompson*, 93 So. 2d 90, 92 (Fla. 1957) ("[I]t is well settled that res judicata is not a defense in a subsequent action where the law under which the first judgment was obtained is different from that applicable to the second action." (citing *Wagner v. Baron*, 64 So. 2d 267 (Fla. 1953))). Importantly, we have also said that "resentencing is a de novo proceeding in which the decisional law effective at the time of the resentencing applies." *State v. Fleming*, 61 So. 3d 399, 400 (Fla. 2011). *Poole*, not *Hurst*, was "the decisional law effective at the time of [Jackson's] resentencing." *Id.* That we declined to "reinstate[]" Jackson's vacated sentences post-*Poole*, *see* 306 So. 3d at 937, in no way meant that *Hurst* would control at resentencing.

**4.**

Jackson argues that the legislature, in response to goading by his prosecutors, targeted him to ensure that the 2023 amendments (Senate Bill 450 or SB 450) would apply at his resentencing. This, says Jackson, "strip[ped] him of the right to a unanimous jury" and amounted to a "bill of attainder." *See* art. I, § 10, cl. 1, U.S. Const. ("No State shall . . . pass any Bill of Attainder . . . ."); *see also* art. I,

§ 10, Fla. Const. ("Prohibited laws.—No bill of attainder . . . shall be passed."). We disagree.

In support of his targeting claim, Jackson cites certain legislator comments made while SB 450 was being enacted. He claims the comments "highlighted one and only one *pending* capital case—this one." But the comments instead primarily refer to certain completed cases—perceived miscarriages of justice—that involved nonunanimous death recommendations, most notably that of Nikolas Cruz. Indeed, Jackson acknowledged below that "[t]he catalyst for th[e] new law" was "Cruz's life sentence."

Jackson also cites text messages between the lead prosecutor and a legislator (the prosecutor's former colleague) in which the prosecutor repeatedly asks if SB 450 would be in effect at the time of Jackson's resentencing. These text exchanges, says Jackson, amount to "goad[ing]" by prosecutors for *the legislature* to target Jackson. And yet the first text sent by the prosecutor was on April 13, 2023, weeks after SB 450 had already passed in the senate and the same day that its companion bill passed in the house.

Jackson—record cites and all—falls far short of establishing that SB 450 amounts to a bill of attainder. This Court has said

that "[a] bill of attainder is a law that legislatively determines guilt for prior conduct and inflicts punishment upon an identifiable individual without the protections of a judicial trial." *Mayes v. Moore*, 827 So. 2d 967, 972 (Fla. 2002) (citing *Cassady v. Moore*, 737 So. 2d 1174, 1178 (Fla. 1st DCA 1999)).  Jackson obviously cannot meet that definition.

The Supreme Court has described bills of attainder as "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315 (1946).  Jackson cannot meet this definition either.

SB 450 does not "name[]" Jackson or any other "individuals." Nor does SB 450 apply "to easily ascertainable members of a group."  Rather, SB 450 applies to defendants convicted of capital murder, including certain *Hurst*-resentencing defendants like Jackson.  SB 450 is thus a "rule[] of general applicability." *United States v. Brown*, 381 U.S. 437, 461 (1965).

Jackson also provides no authority to support the proposition that a procedural change "inflict[s] punishment" for purposes of a

bill of attainder.  Jackson's "best" case might be *Dugger v. Williams*, 593 So. 2d 180 (Fla. 1991), which said that "some procedural matters have a substantive effect."  *Id.* at 181.  But this Court said that in the context of "ex post facto violation[s]."  *Id.*  And *Williams* involved the application of a law that impermissibly "diminish[ed] a substantial substantive advantage that [defendant] would have enjoyed under the law existing at the time he committed his offense."  *Id.* at 182.  Whatever "substantial substantive advantage" Jackson "would have enjoyed," if any, certainly did not "exist[] at the time he committed [the murders]," when the 7-5 statute was in effect.

Finally, Jackson fails to adequately brief the "without a judicial trial" prong of *Lovett*.  Perhaps that is because the new procedural rules apply *at* a trial.  We reject this claim.

**5.**

Jackson argues that Florida's "lack of Eighth Amendment safeguards [has] resulted in an arbitrary, capricious, and unconstitutional sentence."  Jackson presents both a facial and as-applied challenge to Florida's sentencing scheme.  We reject both.

Jackson's facial challenge is built on the following purportedly

"discarded . . . safeguards": the abandonment of comparative proportionality review in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020); the abandonment of relative culpability review in *Cruz v. State*, 372 So. 3d 1237 (Fla. 2023); the 2023 amendments; "aggravator creep"; and this Court purportedly "no longer actively polic[ing] capital cases for error."

This Court has repeatedly rejected similar Eighth Amendment facial challenges. Last year, for example, this Court rejected a "safeguards" argument that relied in part on "aggravator creep" and *Lawrence*. *See Miller v. State*, 379 So. 3d 1109, 1127 (Fla.), *cert. denied*, 145 S. Ct. 241 (2024); *see also, e.g., Wells v. State*, 364 So. 3d 1005, 1015 (Fla. 2023) (rejecting facial overbreadth challenge based on aggravator creep and *Lawrence*). Our holding in *Cruz* "does not alter our analysis." *Wells*, 364 So. 3d at 1015. As *Cruz* explained, "relative culpability review is neither constitutionally required nor consistent with ensuring that a constitutional capital sentence was rendered." 372 So. 3d at 1245. Nor do the 2023 amendments alter our analysis. Again, "the Eighth Amendment does not require a jury's favorable recommendation before a death penalty can be imposed." *Poole*, 297 So. 3d at 505 (citing *Spaziano*,

468 U.S. at 464-65). As far as Jackson's suggestion that this Court rubber-stamps death sentences, it warrants no response other than a strong caution to counsel.

Lastly, in his "facial" challenge, Jackson references the jury instructions, decisions by the resentencing judge, and other *Hurst* resentencings, without explaining how these points factor into a facial challenge. In any event, we address them elsewhere.

Jackson's as-applied challenge largely turns on the fact that "twice juries have refused to unanimously sentence him to death," that no codefendant of his was sentenced (or resentenced) to death,[3] and that most *Hurst*-resentencing defendants were resentenced under the unanimity requirement. According to Jackson, his sentences turn on "timing and geography"—rather than on Jackson masterminding the buried-alive murders.

As an initial matter, the relevance of Jackson's 8-4 jury

_____

3. None of Jackson's codefendants are on death row. As noted above, Nixon "enter[ed] into a plea agreement" and "received concurrent sentences of forty-five years' imprisonment." *Jackson*, 18 So. 3d at 1021 & n.2. Wade and Cole—like Jackson—originally received death sentences followed by *Hurst* relief. Unlike Jackson, however, Wade and Cole were resentenced to life in prison (Wade under the 12-0 statute, Cole under the 2023 amendments).

recommendations is unclear; his current and former sentences were authorized under the statutory schemes then in effect. Jackson's codefendants' sentences are similarly not relevant; to the extent Jackson—the self-confessed ringleader—argues relative culpability, it "is neither constitutionally required nor consistent with ensuring that a constitutional capital sentence was rendered." *Cruz*, 372 So. 3d at 1245. Finally, Jackson's claim regarding other *Hurst* defendants sounds in equal protection and is addressed below.

**6.**

Jackson claims his trial and sentence violated equal protection. Conceding that rational basis review applies, he cites *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), arguing that the State created a "class of one" in that he "so far" is the only *Hurst*-resentencing defendant, of the "less than 60 [who] remained to be resentenced when [Senate Bill 450 became law]," to be sentenced to death under the 8-4 statute. To the extent this claim is adequately briefed, it fails. Jackson's argument is grounded in the meritless notion that all *Hurst*-resentencing defendants must receive the "benefit" of the procedures enacted in response to the erroneous holdings of *Hurst*.

*Village of Willowbrook* does not support Jackson's claim. There, the respondent brought a "class of one" claim against the Village, and the Supreme Court held that her allegations were "sufficient to state a claim for relief under traditional equal protection analysis." *Id.* at 564-65. The respondent "allege[d] that she ha[d] been intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Id.* at 564. Specifically, she alleged that the Village demanded a 33-foot easement before agreeing "to connect [her] property to the municipal water supply," even though "the Village only required a 15-foot easement from other property owners." *Id.* at 563. Here, even assuming Jackson otherwise sufficiently alleges a claim of equal protection, there is plainly a rational basis for applying the 2023 amendments at a *Hurst* resentencing taking place after the effective date of the procedural amendments.

For its part, the State says *Dobbert v. Florida,* 432 U.S. 282 (1977), controls. *Dobbert* rejected an equal protection claim from a petitioner who committed murders prior to *Furman v. Georgia*, 408 U.S. 238 (1972), but was tried and sentenced to death under Florida's "new death penalty procedure" enacted after *Furman*. 432

U.S. at 287-88, 301. Prisoners who were tried and sentenced to death under Florida's pre-*Furman* statute, however, had their death sentences commuted to life sentences by this Court. *Id.* at 301 (citing *Anderson v. State*, 267 So. 2d 8 (Fla. 1972); *In re Baker*, 267 So. 2d 331 (Fla. 1972)). *Dobbert* rejected the petitioner's argument that "the imposition of the death sentence upon him pursuant to the new statute which was in effect at the time of his trial denie[d] him equal protection." *Id.* *Dobbert* reasoned that "Florida obviously had to draw the line at some point" and that the petitioner was "simply not similarly situated to those . . . whose cases had progressed sufficiently far in the legal process as to be governed solely by the old statute." *Id.* Jackson's claim pales in comparison to the unsuccessful claim in *Dobbert*.

## C. Alleged Errors at Resentencing

Jackson's remaining eight issues focus on decisions by the judge and statements by the prosecutor. These claims do not warrant a new penalty phase.

### 1.

Jackson claims the court's final instructions were inaccurate and misleading in violation of section 921.141 and *Caldwell v.*

*Mississippi*, 472 U.S. 320 (1985). The crux of his claim is that the court, over "consistent[]" objection, "including under the Eighth Amendment and *Caldwell*," made repeated and unqualified references to the jury returning a "recommendation," without instructing the jury that a "recommendation" of life—unlike a recommendation of death—was binding on the court. Jackson notes that the Committee on Standard Jury Instructions later put out model instructions informing the jury that "[i]f fewer than 8 jurors vote for the death penalty, the Court must sentence the defendant to life in prison without the possibility of parole." Fla. Std. Jury Instr. (Crim.) 7.11. Jackson says the absence of that instruction (or something like it) misled the jury and lessened the jury's sense of responsibility. According to Jackson, had the jury been informed of its power to issue a binding recommendation of life, the "four life jurors" would have "fought longer" to secure one more vote.

We conclude that the jury should have been instructed about the binding effect of a life recommendation—that, after all, is consistent with what the statute says. And it is unclear why that did not happen. But that was not the nature of Jackson's

arguments below. Indeed, our review of the record reveals that the *Caldwell* issue Jackson advances is not the *Caldwell* issue argued below. We disapprove this sleight of hand. And we conclude that the unpreserved error here was far from fundamental.

**a.**

Jackson misrepresents the nature of defense counsel's "consistent[]" objections. The objections were that the term "recommendation" by itself—despite its use in section 921.141— diminished the jury's sense of responsibility. Indeed, Jackson's position, articulated prior to the penalty phase, was that the amended statute itself violates *Caldwell*.

The relevant events began on May 10, 2023, when Jackson filed a motion raising objections to the 2023 amendments. Among other things, Jackson raised a *Caldwell* claim challenging the amended statute. He claimed that the statute's repeated use of the term "recommendation," when "viewed in combination with the jury receiving permission to recommend a sentence of death with the agreement of only eight jurors," ultimately "*bake[d] Caldwell error into the statute (which will inevitably be included in the jury instructions).*" (Emphasis added.) Thus, Jackson's claim focused on

the word "recommendation" and on nonunanimous *death* recommendations, not on the effect of a life recommendation.

Jackson's motion provides the relevant backdrop and shows what defense counsel had in mind when defense counsel began repeatedly voicing instruction-based objections during the penalty phase whenever the judge said "recommendation." As early as the questioning of one potential juror during jury selection, after the judge mentioned "a jury recommendation," defense counsel "[o]bject[ed] to recommendation" and "object[ed] to the recommendation language." In overruling the objection, the judge noted "that that's exactly what the statute says in the jury instruction." Later, during the questioning of a different prospective juror, defense counsel objected on the same ground and was given "a standing objection." Simply put, defense counsel's objections were not to—as Jackson claims—the "unadorned and unqualified use of the term 'recommendation,' with respect to a life vote," but to the term "recommendation" itself.

Jackson does point to one instance—the only instance supported by his record citations—where defense counsel expressed "concern[] about the idea that it's suggested to the jury that their

verdict is advisory when if they return a verdict of life it is not advisory. It is life. The Court shall impose it." But context matters. Those comments were made after the judge—who was seemingly under the mistaken impression that the 2023 amendments reverted the law back to the pre-*Hurst* days—proposed that the jury instructions not only use the term "recommendation" but also "advisory." It was in *that* context that defense counsel expressed "concern[]" and noted that "a verdict of life . . . is not advisory." The judge responded by saying: "But in the instructions we tell them that if their recommendation is life that's it. It's over." Defense counsel then promptly *agreed* with the judge by saying "Right." This agreement reflects counsel's belief that the instructions included the binding-effect language—meaning that counsel would have had no reason to argue that its omission resulted in *Caldwell* error. As such, this exchange reinforces that the binding effect of a life recommendation was *not* the basis of defense counsel's repeated objections.

In closing arguments, defense counsel at one point even stated to the jury that "the law makes the final decision the Judge has." But counsel made other statements strongly suggesting the jury

could bind the judge with a "life recommendation." Indeed, counsel not only said that "[i]t takes five jurors to get a life sentence," but counsel went on to "assure" the jurors that the judge would "follow [their] recommendation" and that, in the end, "[their] decision is the final decision."

As to the final charge, the judge did not use the term "advisory," instead using the terms "verdict," "decision," and, of course, "recommendation." The judge also instructed the jurors to act with "regard to the gravity of the[] proceedings" and implored them to "carefully consider and weigh the evidence realizing that a human life is at stake." Although the judge and defense counsel had agreed the instructions would inform jurors of the binding effect of a life recommendation, the instructions—for unexplained reasons—did not. But *that* oversight, which gave rise to the issue advanced on appeal, was not the issue argued below.

## b.

As just shown, Jackson quietly attempts to transform defense counsel's *Caldwell* objections into a different *Caldwell* and instructional error claim on appeal. This he cannot do.

As to the jury instruction, yes, there was error in the sense

that the court failed to specify how the jury's recommendation would inform the scope of the judge's sentencing discretion. But we disagree with Jackson that the court "misled" the jury into believing the court could simply disregard its recommendation.[4] Quite the opposite.

As an initial matter, the judge in the final charge not only used the term "recommendation," but also the terms "verdict" and "decision." Moreover, the judge instructed the jurors to act with "regard to the gravity of the[] proceedings" and implored them to "carefully consider and weigh the evidence realizing that a human life is at stake." Obviously, the judge conveyed to the jury the significance of its role rather than minimizing its responsibility. Even defense counsel, after explaining that "[i]t takes five jurors to get a life sentence," "assure[d]" the jurors—without objection—that

---

4. Jackson's "instructional error" claim relies solely on *Butler v. State*, 493 So. 2d 451 (Fla. 1986), in which an "extremely misleading and confusing jury instruction" amounted to harmful error. *Id.* at 453. *Butler* is easily distinguished. Putting aside that the issue there was preserved, the instruction was not only "unrelated to the evidence," *id.* at 452, but it "was misleading and contradictory" in the sense that it "virtually negated the defendant's only defense, that of self-defense," *id.* at 453.

their "decision is the final decision."

There is plainly no fundamental error. It cannot be said that the unpreserved error here "reaches down into the validity of the trial itself to the extent that the jury's recommendation of death could not have been obtained without the assistance of the alleged error." *Cruz v. State*, 320 So. 3d 695, 715 (Fla. 2021) (citing *Smiley v. State*, 295 So. 3d 156, 172 (Fla. 2020)). Jackson, of course— given that he portrays an unpreserved claim as "consistent[ly]" argued—does not explain how any error here would be fundamental.

Jackson does, however, offer a theory of prejudice—one that is devoid of merit and, perhaps unsurprisingly, cannot be squared with the record. Jackson theorizes that, if instructed on their power to return a binding life recommendation, then the "four life jurors" would have "fought longer" to secure one more vote. That theory is not only speculative, but it is wholly at odds with defense counsel's own statements to the jury. Jackson fails to mention that defense counsel stressed to the jurors during closing arguments that, as was discussed during jury selection, they were *not* to attempt to sway other jurors. Indeed, counsel reminded them that

- 37 -

they had "promised" and "agreed" "to not bully, not force someone to change their opinion, not to go against someone's opinion, to let them make their individual decision."

As to *Caldwell*, even putting aside Jackson's improper presentation of his transformed *Caldwell* claim, we are hardly convinced by Jackson's briefing that the instructional error here amounts to a *Caldwell* violation.

*Caldwell* addressed "whether a capital sentence is valid when the sentencing jury is led [by the prosecutor] to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case." 472 U.S. at 323. The *Caldwell* plurality concluded "that the prosecutor's argument rendered the capital sentencing proceeding inconsistent with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Id.* (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). Justice O'Connor wrote separately, concluding that "the prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of

responsibility." *Id.* at 342 (O'Connor, J., concurring in part and concurring in the judgment).

The Supreme Court has since explained that Justice O'Connor's position in *Caldwell* was "controlling" and that the "infirmity identified in *Caldwell*" was thus that the jury was "affirmatively misled regarding its role in the sentencing process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). Here, the jury was not "affirmatively misled" in the way the jury was in *Caldwell*, even more so given that the judge implored the jurors to "carefully" perform their duty and be mindful of "the gravity of the[] proceedings."

Jackson points to two state supreme court decisions, namely *Commonwealth v. Montalvo*, 205 A.3d 274 (Pa. 2019), and *Clark v. Commonwealth*, 833 S.W.2d 793 (Ky. 1991), that seemingly stand for the broad proposition that the repeated use of the term "recommendation" violates *Caldwell*. *See Montalvo*, 205 A.3d at 299; *Clark*, 833 S.W.2d at 795. That proposition, of course, was the issue Jackson advanced below, not the issue he advances on appeal. In any event, *Clark* and *Montalvo* are distinguishable for various reasons, including that the law in those jurisdictions

seemingly rested the sentencing decision solely in the hands of "the jury," *Montalvo*, 205 A.3d at 297, and "not . . . the trial judge," *Clark*, 833 S.W.2d at 796.

For some reason, Jackson does not cite other decisions that are more like the mutated *Caldwell* claim he attempts to advance on appeal. *See, e.g., Mapes v. Coyle*, 171 F.3d 408, 414-15 (6th Cir. 1999) (rejecting a " 'recommendation' issue" *Caldwell* claim in which the defendant argued that the judge "repeatedly told the jury that its job was merely to recommend a sentence," even though, under the relevant Ohio statute, "a 'recommendation' *not* to impose the death penalty would be binding on the court"); *cf. Jones v. United States*, 527 U.S. 373, 381-82 (1999) (citing *Romano* and rejecting the notion "that a death sentence is arbitrary within the meaning of the Eighth Amendment if the jury is not given any bit of information that might possibly influence an individual juror's voting behavior").

In the end, Jackson falls far short of establishing that a new penalty phase is warranted.

**2.**

Jackson, citing *Lockett v. Ohio*, 438 U.S. 586 (1978), and

*Eddings v. Oklahoma*, 455 U.S. 104 (1982), claims the court violated the Eighth Amendment by barring the jury's consideration of codefendant Wade's life sentence. Jackson argues that Wade's life sentence was a mitigating factor. And he cites decisions in which this Court—without deciding the issue—mentioned that a codefendant's sentence was considered as "mitigation." *E.g.*, *Hertz v. Jones*, 218 So. 3d 428, 431 (Fla. 2017).

The State counters by citing cases from other jurisdictions holding that a codefendant's life sentence is not "mitigation," *see, e.g.*, *Coulter v. State*, 438 So. 2d 336, 345 (Ala. Crim. App. 1982), and by arguing that informing the jury about a codefendant's sentence would lead to "a trial-within-a-trial" regarding the codefendant's "aggravation and mitigation." The State alternatively argues that, given Wade's prior death sentence that was reversed only because of *Hurst*, any probative value of Wade's life sentence would be "substantially outweighed by the danger of unfair prejudice, confusion of issues, [or] misleading the jury." *See* § 90.403, Fla. Stat.; *see also Meyer v. Branker*, 506 F.3d 358, 375-76 (4th Cir. 2007) (holding "that the Constitution does not mandate admission of a co-perpetrator's sentence").

We conclude that Jackson's Eighth Amendment claim was not preserved in the manner now being presented. And any error falls far short of fundamental error.

The relevant events began with the State's "Motion in Limine Regarding Proportionality" filed on May 27, 2022—before Jackson's and Wade's cases were severed. In its motion, the State sought an order "prohibiting arguments or questions regarding the comparison of this death penalty case with other murders." Citing this Court's decision in *Lawrence*, the State reasoned that "no juror could ever properly conduct *a proportionality analysis* as [to] all other death penalty cases." (Emphasis added.)

At a hearing on May 31, 2022, defense counsel for Wade sought to distinguish "appellate proportionality review" from "mitigation." Wade's counsel did so in the context of seeking to argue that Wade was "not the worst of the worst." After the judge expressed his understanding that the State's motion applied only to jury selection, the prosecutor indicated that the motion was intended to apply throughout trial but only encompassed "unknown cases." Indeed, the prosecutor had "no problem with defense counsel saying Mr. Wade is not the worst of the group." The judge

- 42 -

again indicated "that the matter [regarded] jury selection," in which case he "agree[d]" with the State. Days later, the court entered an order granting in part and denying in part the State's motion "to the extent Defendant may not rely upon other specific unrelated cases in making proportionality arguments."

Fast forward one year to May 22, 2023, after the State rested its case in Jackson's new penalty phase. (Wade had since been resentenced to life.) Counsel for Jackson brought up the State's proportionality motion from a year earlier and indicated to the judge that "pursuant to [the court's order]," the defense intended to introduce Wade's judgment and sentence. After objection, the judge—who also presided over Wade's resentencing—indicated that the jury was "not going to know what sentence I was imposing against Mr. Wade." Defense counsel pressed the court on whether it was "reversing [its] prior ruling." After the judge admitted to having "no clue" whether any ruling was being reversed, the judge reiterated, "It's not coming in." Defense counsel then "want[ed] the record to be clear" in terms of the court's 2022 ruling regarding "making proportionality arguments."

The Eighth Amendment claim Jackson advances was simply

not preserved. The only argument Jackson raised below was that the 2022 order regarding "proportionality arguments" somehow authorized an eventual life sentence for Wade to later be presented to Jackson's jury. Defense counsel for Jackson never mentioned "mitigation," *Lockett*, *Eddings*, the Eighth Amendment, or any decision from this Court. Other record citations by Jackson do not establish that this issue was properly presented.[5] In the end, any error that may have occurred was far from fundamental.

**3.**

Jackson claims that, in violation of the Sixth and Eighth Amendments and Florida law, he was precluded from impeaching codefendant Nixon, whose perpetuated testimony from Jackson's 2007 trial was introduced after Nixon refused to testify at Jackson's

---

5. For example, Jackson cites "a hearing in April of 2022," before the State filed the "proportionality" motion, at which the prosecutor stated that he had not researched whether it would be "appropriate" to "comment[] on another jury's verdict." That comment came in the context of discussing whether a verdict in one codefendant's case would be sealed before completion of the other case. In response, counsel *for Wade* argued that "it possibly might deny [Wade] a possible mitigator" if Jackson received a life sentence and then Wade was prevented from "argu[ing] the fact that [Wade] was less culpable." This exchange hardly supports the conclusion that Jackson—in May 2023—preserved the claim he advances.

resentencing in 2023. Jackson says that Nixon recanted at codefendant Wade's resentencing in 2022 and that when Jackson sought to introduce that recantation, the judge denied the request. According to Jackson, the judge's decision resulted in "a death verdict from a jury oblivious to the fact that a key state witness had recanted." In his reply brief, Jackson concedes that no specific objection or legal argument was presented after the judge denied the request. Jackson thus requests "revers[al] under the preserved general objections or under fundamental error." We reject this claim.

At Wade's resentencing, Nixon briefly attempted to limit his own culpability. After Nixon testified that Wade told him they had to dig a hole, that they stole shovels, that Nixon found the remote location, and that Nixon, Wade, and Jackson dug the hole, the prosecutor asked if Nixon knew or later learned the purpose of the hole. Nixon began purportedly recanting by answering in the negative. He also said that his prior testimony was what his lawyer "wanted [Nixon] to say." At that point, the court took a recess, and Nixon never returned to testify. Nixon attempted to explain himself outside the jury's presence, including that he was on drugs at the

time of the murders. Nixon later invoked the Fifth Amendment.

At Jackson's resentencing, Nixon again invoked the Fifth Amendment, and the judge found Nixon "unavailable to testify." Days later, defense counsel "ask[ed] to introduce Mr. Nixon's prior testimony [from Wade's resentencing]." The judge, who was aware of the content of that testimony, denied the request. Defense counsel moved on without objection or any legal argument.

Even assuming the court erred, Jackson cannot establish fundamental error. Indeed, any error would be harmless beyond a reasonable doubt given, among other things, Jackson's own admissions—including in court—regarding his involvement as the mastermind of the crimes. Nixon's purported recantation does not undermine the factual narrative of the murders. *See Jackson*, 18 So. 3d at 1021-22. Nor would it undermine any aggravator or bolster any proposed mitigating circumstance.

**4.**

Jackson claims the prosecutor's "repeated misconduct" deprived Jackson of a fair sentencing trial. Jackson points to more than a dozen comments by the prosecutor and places them into two categories: (1) comments denigrating mitigation; and (2) comments

injecting fear and emotion into the sentencing determination.

The record reveals that, other than three alleged denigration remarks, the comments all went without proper objection. We separately address the two categories of alleged errors, and we conclude that although the prosecutor may have made questionable comments at times, the comments fall well short—individually or cumulatively—of amounting to fundamental error. Including the objected-to comments, no new penalty phase is warranted.

**a.**

This Court has said "that a prosecutor cannot improperly denigrate mitigation during a closing argument." *Delhall v. State*, 95 So. 3d 134, 167-68 (Fla. 2012) (quoting *Williamson v. State*, 994 So. 2d 1000, 1014 (Fla. 2008)). Jackson claims the prosecutor denigrated mitigation in its entirety and several of its components. We first address the few comments met with any objection.

The first objected-to comment was that "[m]itigation is a biased, paid for industry." But that comment, viewed in context, does not "appear[] designed to invalidate the mitigation entirely." *Id.* at 168. Rather, the comment appears aimed at establishing the bias of Jackson's paid experts. Indeed, immediately after that

comment and later in closing, the prosecutor challenged the experts' testimony, including by questioning the suggestion that Jackson was "[s]everely brain damaged," given that his IQ was "well over a hundred." We find no harmful error.

Second, after arguing that Jackson "was the leader, he was the oldest, he was the felon, not the 18[-]year[-]old kids he got to do his work for him," the prosecutor said this: "Judge him not by what you heard in this courtroom. Judge him by when he was free." This comment was objected to as a "mischaracterization of the law." And the judge informed the jurors that he "will tell [them] what the law is when it comes time to do it." We find no reversible error.

Third, Jackson objected when the prosecutor questioned whether Jackson's "remorse" was something for which he was "supposed to get credit." This comment was made in the context of the prosecutor explaining to the jurors that it was their job to "decide whether or not it's mitigation to say you are sorry after you are caught" or whether Jackson was instead attempting to avoid death row. We have said that a prosecutor can "attempt[] to rebut mitigating evidence argued by the defense," *Cruz*, 320 So. 3d at 718 (alteration in original) (quoting *Poole v. State*, 997 So. 2d 382, 395

(Fla. 2008)), including "nonstatutory mitigating evidence of remorse," *Walton v. State*, 547 So. 2d 622, 625 (Fla. 1989) (citing *Agan v. State*, 445 So. 2d 326 (Fla. 1983)). Here, the prosecutor did just that, questioning the sincerity of Jackson's remorse and, in support, referencing past actions by Jackson. Moreover, the prosecutor "did not label the mitigation as aggravation." *Cruz*, 320 So. 3d at 718. We find no harmful error.

Finally, the prosecutor, during cross-examination of defense expert Dr. Ouaou, asked—over objection—whether the results of neuropsychological testing performed by Dr. Ouaou "excuse[d]" Jackson's actions. This Court has said that "[i]mproper denigration includes comments characterizing mitigation as 'flimsy,' 'phantom,' and 'excuses.' " *Id.* (quoting *Carr v. State*, 156 So. 3d 1052, 1065 (Fla. 2015)). That did not happen here. The prosecutor's isolated use of the word "excuse" was made in the context of asking about Jackson's mental status and whether the testing results suggested he lacked the ability to know it was wrong "to bury two people alive." We find no harmful error.

As to the unobjected-to comments, they do not support a finding of fundamental error. Regarding mitigation in its entirety,

Jackson points to this comment by the prosecutor: "Do not judge him by the clergy who visit him or by the lectures from paid advocates but by his behavior when he was free."  Although not particularly well-worded, the comment appears designed to "simply urge less weight" to the mitigators, *Delhall*, 95 So. 3d at 168, and more weight to the aggravation.  Indeed, the prosecutor's reference to Jackson's "behavior when he was free" was followed by this comment: "This is the type of evidence that Lady Justice considers powerful, weighty."

Regarding mitigation "components," Jackson points to certain additional comments regarding his "remorse."  But, again, the prosecutor was permitted to "attempt[] to rebut mitigating evidence argued by the defense."  *Cruz*, 320 So. 3d at 718 (alteration in original) (quoting *Poole*, 997 So. 2d at 395).

Jackson also points to comments about his "Messianic Jewish faith."  One of Jackson's proposed mitigators was that he has found God and devoted his life to religious study.  Among other things, Jackson presented testimony from his spiritual advisor, John Slatten, who testified about Messianic Jewish faith, including that "regular Jews don't accept us," and testified that Jackson was "the

- 50 -

most ardent and zealous follower of Jesus of Yeshua that [Slatten] minister[ed] to in prison." Jackson points to three unobjected-to comments, namely: (1) that Jackson was a "South Carolina kid that somehow celebrat[es] Passover like he is a religious Jew"; (2) that "Jews for Jesus" was "a small fringe religion"; and (3) that the jury should "not judge [Jackson] by the clergy who visit him." The State correctly asserts that the prosecution may "call[] into doubt the sincerity of [Jackson's] professed beliefs." But the State concedes that some of these comments "approached a line."

We conclude that the first two comments were clearly inappropriate.[6] Those comments did not simply challenge the sincerity of Jackson's profession of certain beliefs. Instead, they disparaged the religious beliefs that he professed. The comments focused on the content of the beliefs—not the sincerity with which they were held. Nevertheless, we cannot conclude, on this record, that the two otherwise isolated comments amount to fundamental

---

6. We note that the ethical rules governing lawyer conduct specifically prohibit "knowingly, or through callous indifference" "disparag[ing]" a party "on account of . . . religion." R. Regulating Fla. Bar 4-8.4(d).

error, i.e., error without which "the jury's recommendation [and the sentence] of death could not have been obtained." *Allen v. State*, 416 So. 3d 291, 311 (Fla. 2025) (alteration in original) (quoting *Colley v. State*, 310 So. 3d 2, 17 (Fla. 2020)); *see Ritchie v. State*, 344 So. 3d 369, 386 (Fla. 2022) (rejecting claim of cumulative fundamental error and concluding that "the interests of justice d[id] not require a new penalty phase" where certain unobjected-to "improper prosecutorial comments were isolated statements in an otherwise proper closing argument that, on the whole, asked the jury to return a death recommendation based on the evidence").

For his part, Jackson does not explain how these two inappropriate comments support a finding of fundamental error. Nor do the two cases he cites support such a finding. *See Cutter v. Wilkinson*, 544 U.S. 709, 718 (2005) (addressing "the question whether [the Religious Land Use and Institutionalized Persons Act of 2000]'s institutionalized-persons provision, § 3 of the Act, is consistent with the Establishment Clause of the First Amendment"); *Dawson v. Delaware*, 503 U.S. 159, 160, 168-69 (1992) (holding that "the First and Fourteenth Amendments prohibit[ed] the introduction in a capital sentencing proceeding of the [irrelevant]

fact that the defendant was a member of an organization called the Aryan Brotherhood," and noting that the wrongful admission of the evidence would be subject to harmless error review on remand).

As to the final unobjected-to comment in this category, Jackson argues the prosecutor invalidated Jackson's right to present state-funded experts when the prosecutor made certain comments, including "let's analyze what the $40,000 gets you, analyze whether or not it's garbage in and garbage out." Although the prosecutor could have been more tactful, the bias of the paid experts was, again, fair game, particularly given that the prosecutor in closing also engaged with their testimony.

**b.**

Nor do the unobjected-to comments in the second category—a "dissertation on evil" and a "golden rule" violation—support a finding of fundamental error.

This Court has said that "a prosecutor may not 'impermissibly inflame[] the passions and prejudices of the jury with elements of emotion and fear.' " *Cruz,* 320 So. 3d at 720 (alteration in original) (quoting *Brooks v. State,* 762 So. 2d 879, 900 (Fla. 2000)). *Cruz* also said that a prosecutor may not give a "dissertation on evil," *id.*

(quoting *King v. State*, 623 So. 2d 486, 488 (Fla. 1993)), which "effectively caution[s] the jurors that they would be cooperating with evil should they recommend[] life imprisonment," *id.* But "the use of the term evil alone during closing statements does not entitle a defendant to a new trial." *Rigterink v. State*, 193 So. 3d 846, 876 (Fla. 2016) (citing *Lugo v. State*, 845 So. 2d 74, 107 (Fla. 2003)).

Here, the prosecutor framed this case as an attempt to punish evil crimes. In opening, for example, the prosecutor referenced the "evil . . . acts," the "vile and cruel acts," the "soulless darkness where these crimes were conceived," and that "some evil is just too great to tolerate," before referencing "the especially heinous, atrocious and cruel that one human being is capable of." *See* Fla. Std. Jury Instr. (Crim.) 7.11(8) (addressing HAC aggravator and defining "heinous" to mean "extremely wicked or shockingly evil"). The prosecutor used similar language in closing.

Perhaps the prosecutor could have used the word "evil" with less frequency. But the cases on which Jackson relies, namely *Cruz*, 320 So. 3d 695, and *Rigterink*, 193 So. 3d 846, do not support a finding of fundamental error. In *Cruz*, the defendant "failed to show how the prosecutor's comments improperly inflamed

- 54 -

the passions of the jury and amount[ed] to fundamental error."  320 So. 3d at 720.  And in *Rigterink*, this Court found that "[t]o the extent [the prosecutor's closing remarks describing the defendant as evil] were used to support the HAC aggravating factor, they were improper."  193 So. 3d at 876.  But this Court concluded that the defendant "failed to establish prejudice."  *Id.*  We reasoned that HAC was otherwise proven and so was the prior violent felony aggravator, "two of the weightiest aggravating circumstances."  *Id.* Here, unlike in *Rigterink*, the prosecutor's remarks were largely aimed at the defendant's acts, not at the defendant himself. Moreover, this case involves *eight* aggravators—including HAC and prior violent felony.  And there is no suggestion that HAC was not otherwise proven.  Lastly, we note that Jackson himself used the phrase "evil spirit" during his confession to a news show.  Jackson is not entitled to a new penalty phase.

Jackson next claims that the prosecutor's comments regarding "evil" and "soulless darkness" impermissibly framed Jackson as "inherently dangerous."  This, says Jackson, was prohibited by *Delhall*.  This case falls short of *Delhall*, where "the prosecutor argued numerous times, sometimes over objection and sometimes

without objection, that [the defendant] is 'violent,' 'dangerous,' that he 'can't be fixed,' that 'he acts with violence,' and '[f]rom a school child he was violent.' " 95 So. 3d at 168 (second alteration in original). *Delhall* vacated the death sentence based on "cumulative errors" that included "improper advocacy . . . even after an objection was sustained" and after the court "specifically admonish[ed] [the prosecutor] to stop." *Id.* at 170. That is not this case.

Jackson also claims the prosecutor impermissibly "used his opening to bolster the State's decision to pursue death." Jackson cites this comment: "The state is presenting this case because some evil is just too great to tolerate. . . . Some evil can only sufficiently be punished by imposing a just sentence of the ultimate punishment." This, says Jackson, runs afoul of cases like *Pait v. State*, 112 So. 2d 380, 384 (Fla. 1959), where the prosecutor wrongly "conveyed to the jury the fact that he and his staff had considered the matter before trial and had concluded that the death penalty should be requested." *See also Brooks v. State*, 762 So. 2d 879, 901-02 (Fla. 2000) (concluding that trial court abused its discretion in overruling defense counsel's objection "that the prosecutor impermissibly argued 'prosecutorial expertise' "). Here,

the prosecutor's comments are less direct than those in *Pait* or *Brooks* and fall more into the "appropriate" realm of "urg[ing] the jury to prescribe the supreme penalty on the basis of the evidence which the jury hears." *Pait*, 112 So. 2d at 384.

Lastly, Jackson claims the prosecutor violated the "golden rule" of summations. A "golden rule" argument impermissibly "invite[s] the jurors to place themselves in the victim's position during the crime and imagine the victim's suffering." *Braddy v. State*, 111 So. 3d 810, 842 (Fla. 2012) (quoting *Mosley v. State*, 46 So. 3d 510, 520 (Fla. 2009)). Improper "golden rule" arguments also include "creating an imaginary first-person script depicting the victim's suffering or death." *Id.* at 849 (citing *Urbin v. State*, 714 So. 2d 411, 421 (Fla. 1998)).

Here, Jackson says the prosecutor fabricated an "imaginary script" of the victims' dying thoughts. He points to the following comment the prosecutor made in closing while arguing for HAC:

> You know, Carol and Reggie Sumner saw a gun in that house. Remember the little toy gun, the little BBs? And when they are in that hole and they realize that they are not getting out of that hole they may have thought about that gun putting two bullets in the back of their heads in this.

That comment was met by an objection of "[i]mproper argument," which was overruled. That "nonspecific objection" does "not preserve[]" "an imaginary first-person script . . . golden rule argument." *Id.* at 850. And Jackson certainly cannot establish fundamental error.

As an initial matter, it is not entirely clear that, as Jackson asserts, "[t]he prosecutor wanted the jury to imagine a suffering so great that the victims wished for an execution-style death." It seems plausible that the prosecutor instead suggested that the victims wondered if they were going to be executed. In any event, theorizing whether the victims—while duct-taped and in the hole—wondered about the "gun" with which they were earlier held at "gunpoint," seems like a reasonable inference based on the evidence. This case is more like *Rogers v. State*, 957 So. 2d 538 (Fla. 2007). There, the prosecutor theorized that, while dying from two stab wounds, the victim was "reflecting back on her life," including "on her children that she would never see again" and "on her mother who loved her so dearly." *Id.* at 549. *Rogers* concluded that the "arguments were not improper because they were based upon facts in evidence—the victim was stabbed twice, she struggled

- 58 -

with her assailant, and she remained alive for at least a short period of time," and that "the prosecutor was describing the heinousness of the crime for the purpose of establishing the HAC aggravator." *Id.* Here, the comments can similarly be said to be "common-sense inference[s]" made in the context of arguing for HAC. *See id.* (quoting *Banks v. State*, 700 So. 2d 363, 366 (Fla. 1997)).

**5.**

Jackson asserts that the four preceding points of error—i.e., (1) *Caldwell* and instructional error; (2) Wade's life sentence; (3) Nixon's impeachment; and (4) prosecutorial misconduct—are "indisputable errors . . . subject to cumulative-error analysis." And he says that the cumulative prejudice was not "harmless beyond a reasonable doubt." That statement, of course, assumes that the alleged errors were properly preserved. But as just explained, other than three alleged denigration-of-mitigation comments by the prosecutor (none of which involve harmful error), none of the alleged errors were preserved. So, the more appropriate question is "whether the combined prejudice resulting from any errors . . . amounts to fundamental error." *Ritchie*, 344 So. 3d at 388. And we

- 59 -

unhesitatingly answer in the negative.

We have already concluded that any potential errors in the prosecutor's comments do not cumulatively amount to fundamental error. Because Nixon's supposed recantation does not undermine Jackson's confessions or impact any aggravation or mitigating circumstances, any error in excluding that recantation has no effect on a cumulative-error analysis. Nor does the omission in the jury instruction add much weight in favor of Jackson. Indeed, we have little reason to believe the jury viewed its role as anything but immensely important. Lastly, even assuming that the fact of Wade's life sentence was nonstatutory "mitigation," we conclude that any error falls short of being "outcome-determinative," *id.* at 389, for purposes of the fundamental error standard.

**6.**

Jackson requests a remand for a new sentencing order on the ground that the court failed to explain why it gave "no weight" to five "established" nonstatutory mitigating circumstances. *See supra* Section I.-D (circumstances 5, 8, 18, 22, and 24). Jackson claims the court violated the Eighth Amendment under *Eddings* by "refusing to consider" those five circumstances. And he asserts that

"under Florida caselaw, which clashes with *Eddings*, trial judges must at least give written justification for refusing to give any weight to mitigation." We conclude that no remand is warranted.

In *Rogers v. State*, 285 So. 3d 872 (Fla. 2019), after outlining the requirements for a capital sentencing order, this Court reiterated that "the determination of mitigating and aggravating circumstances and the respective weight assigned to each [are] within the trial court's discretion." *Id.* at 889 (alteration in original) (quoting *Griffin v. State*, 820 So. 2d 906, 913 (Fla. 2002)). And this Court receded from the "requirement that a trial court expressly articulate why the evidence presented warranted the allocation of a certain weight to a mitigating circumstance." *Id.* at 890.

Months later, this Court in *Newberry v. State*, 288 So. 3d 1040 (Fla. 2019), rejected the defendant's argument that "the trial court erred when it found five mitigating circumstances were established but 'not mitigating.'" *Id.* at 1048-49. This Court found no abuse of discretion, reasoning it was "apparent that the trial court considered each of the mitigating circumstances proposed by [the defendant] and determined that such circumstances were in fact not mitigating and assigned them no weight." *Id.* at 1049. Here, it

appears the trial court similarly considered each proposed mitigating circumstance, including five that the court determined "were in fact not mitigating and assigned them no weight." *Id.* Accordingly, we find no error.

*Eddings* does not require a different conclusion. *Eddings* reversed a death sentence where, in violation of *Lockett*, "the sentencer" had impermissibly "refuse[d] to consider, *as a matter of law*, any relevant mitigating evidence," 455 U.S. at 113-14, even though "*Lockett* requires the sentencer to listen" to mitigating circumstances presented by the defendant, *id.* at 115 n.10. Here, the trial court listened. That the trial court accorded no weight to certain asserted mitigating factors does not violate *Lockett*. *See Trease v. State*, 768 So. 2d 1050, 1055 (Fla. 2000) (recognizing that *Lockett* "do[es] not preclude the sentencer from according [a] mitigating factor no weight").

**7.**

Jackson claims the court "constitutionally erred in permitting racially discriminatory cause exclusions of jurors opposed to the death penalty." Jackson sought an order barring death qualification of his jury. Citing certain studies and "[r]acism in

- 62 -

government and the criminal justice system," Jackson argued that death qualification in Duval County disproportionately excludes "jurors of color," which would deprive Jackson of "the right to have a jury that is representative of ones [sic] peers." The court denied Jackson's motion. The court did not err in doing so.

Jackson largely recounts the contents of a study that "examined twelve Duval County capital trials," and he "lists the races and selection outcomes" of jurors in his case. Jackson does not point to any individual potential juror who was erroneously excluded. Instead, he argues that people of color—despite, in his words, having "greater opposition to the death penalty"—are disproportionately excluded from capital juries.

Jackson cannot sidestep *Lockhart v. McCree*, 476 U.S. 162 (1986), which held "that the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." *Id.* at 173. In doing so, *Lockhart* declined to extend "[t]he limited scope of the fair-cross-section requirement" to "petit juries, as opposed to jury panels or venires." *Id.* at 173-74. *Lockhart* further concluded that "death qualification" would not violate the "fair-cross-section requirement" "even if [the Court] were willing to extend the fair-

- 63 -

cross-section requirement to petit juries." *Id.* at 174. *Lockhart* reached its decision over a dissent warning that death qualification would "disproportionately affect the representation of blacks on capital juries." *Id.* at 201 (Marshall, J., dissenting).

Jackson argues that the dissent in *Lockhart* "knew better" than the majority. To the extent Jackson seeks to overturn *Lockhart,* he is in the wrong venue.

**8.**

Finally, Jackson claims the court abused its discretion by denying his motion seeking a continuance or, in the alternative, to proceed under *Hurst.* He presents two points of error. First, he asserts that the failure to continue the case until after model jury instructions were released resulted in the trial court erroneously charging the jury. Second, he asserts that the denial of his motion "deprived his lawyers of a meaningful opportunity to research and raise all viable challenges to the new law." We reject both points.

The abuse of discretion standard regarding a trial court's ruling on a motion for continuance "is generally not met 'unless the court's ruling on the continuance results in undue prejudice to the defendant.' " *Smith v. State,* 170 So. 3d 745, 758 (Fla. 2015)

(quoting *Snelgrove v. State*, 107 So. 3d 242, 250 (Fla. 2012)). Jackson cannot establish undue prejudice.

Jackson's point of error regarding the jury charge is just a repackaging of his failed *Caldwell* claim. And as to Jackson's claimed deprivation of an opportunity to raise "all viable challenges," the record reflects that—as outlined earlier—defense counsel raised and argued numerous challenges, including: res judicata; arbitrariness; bill of attainder; equal protection; lack of adequate safeguards; evolving standards of decency; statutory *Caldwell* violation; right to unanimity; and section 775.022(3) precluding retroactivity. Jackson fails to identify any meritorious challenge he would have raised had he been granted a continuance. Indeed, at one hearing, defense counsel asserted there were "perhaps" additional arguments that could be made.

### III.  CONCLUSION

For the reasons stated above, we affirm the death sentences imposed at Jackson's resentencing.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

"The unusual severity of death is manifested most clearly in its finality and enormity. Death, in these respects, is in a class by itself." *Furman v. Georgia*, 408 U.S. 238, 289 (1972) (Brennan, J., concurring).

Today's decisions in *Hunt v. State*, No. SC2024-0096 (Fla. Dec. 18, 2025), and *Jackson v. State*, No. SC2023-1298 (Fla. Dec. 18, 2025), reject challenges to the 2023 statutory amendment that now requires only eight members of a twelve-person capital jury to vote to recommend the death penalty, and I concur in the result to the extent that these decisions are consistent with what this Court has held since *State v. Poole*, 297 So. 3d 487 (Fla. 2020). However, I write to underscore that the 8-4 threshold renders Florida *the* absolute outlier among states that impose the death penalty. Florida now has the lowest standard in the nation, requiring the fewest number of jurors to recommend the death penalty.

When *Hurst v. Florida*[7] returned to this Court on remand from the United States Supreme Court, I eagerly joined the majority in *Hurst v. State,*[8] which held in part that the United States and Florida constitutions required a jury's recommendation of death to be unanimous. When a majority of this Court receded from the unanimity requirement little more than three years later in *Poole*, I strenuously dissented to the majority's conclusion that *Hurst v. State* was wrongly decided.

Since *Poole*, this Court has consistently held that the constitution does not require a unanimous recommendation of death. My vote to concur in result is an acknowledgment of this precedent. However, the concerns I expressed in my dissent in *Poole* remain. There, I lamented this Court's removal of jury unanimity as a safeguard in Florida's death penalty jurisprudence, and I emphasized *Poole*'s effect of "return[ing] Florida to its status as an absolute outlier among the jurisdictions in this country that

---

7.  *Hurst v. Florida*, 577 U.S. 92 (2016).

8.  *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020).

utilize the death penalty." *Poole*, 297 So. 3d at 513 (Labarga, J., dissenting). At that time, section 921.141, Florida Statutes, had been amended in light of *Hurst v. State* to require a unanimous recommendation of death—and the statute continued to require unanimity until it was amended in 2023.

Among the states that continue to impose the death penalty, only Alabama and Florida permit a nonunanimous jury recommendation of death. *See* § 13A-5-46(f), Ala. Code (2025) (requiring at least 10 members of the jury to recommend a sentence of death); § 921.141(2)(c), Fla. Stat. (2025) (requiring at least eight members of the jury to recommend a sentence of death). Thus, Florida now falls below even the state of Alabama's requirement that at least 10 members of the jury recommend that a capital defendant be sentenced to death. What is more, even the federal death penalty statute requires a unanimous jury recommendation. *See* 18 U.S.C. § 3593(e).

In my view, a jury's unanimous recommendation of death provides a narrowing function that is wholly warranted in this state that, with 30 exonerations, still leads the nation in exonerations from death row. Death Penalty Information Center,

https://deathpenaltyinfo.org/state-and-federal-info/state-by-state/florida (last visited Nov. 12, 2025). While a majority of this Court has held that this Court's interpretation of permissible safeguards in the death penalty context is limited by the conformity clause of the Florida Constitution, I continue to fundamentally disagree that interpretations by the United States Supreme Court constitute a ceiling and not a floor.

For these reasons, and because I continue to adhere to the views expressed in my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020) (receding from the decades-long practice of conducting proportionality review in direct appeals of sentences of death), I can only concur in the result.

An Appeal from the Circuit Court in and for Duval County,
    Michael R. Weatherby, Judge
    Case No. 162005CF010263CXXXMA

Cassandra Stubbs and Brian W. Stull of American Civil Liberties Union, Capital Punishment Project, Durham, North Carolina, Megan D. Byrne and Alexandra C. Valdez of American Civil Liberties Union, Capital Punishment Project, New York, New York, and Daniel Tilley of American Civil Liberties Union Foundation of Florida, Miami, Florida,

    for Appellant

James Uthmeier, Attorney General, Jeffrey Paul DeSousa, Acting Solicitor General, and Michael Mervine, Senior Assistant Attorney General, Tallahassee, Florida,

    for Appellee

Christopher D. Belelieu of Gibson, Dunn & Crutcher LLP, New York, New York,

    for Amici Curiae Representatives Yvonne Hinson, Bracy Davis, Michele Rayner, Dianne Hart, Senator Dwight Bullard, NAACP Florida State Conference, and Equal Ground Education Fund

Melanie C. Kalmanson of Quarles & Brady, LLP, Tampa, Florida,

    for Amici Curiae Florida Association of Criminal Defense Lawyers, the Florida Public Defender Association, Advancing Real Change, Inc., Conservatives Concerned About the Death Penalty, Craig Trocino, Esq., Death Penalty Focus, Florida Justice Institute, Floridians for Alternatives to the Death Penalty, the National Association of Criminal Defense Lawyers, Ripley Whisenhunt, PLLC, Witness To Innocence, and The 8th Amendment Project